# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA, and          )
STATE OF COLORADO,                     )
                                       )
      Plaintiffs,                      )
                                       )
     vs.                               )     Civil Action No. 1:08-cv-00115-SLR
                                       )
HOME DEPOT USA, INC.,                  )
                                       )
      Defendant.                       )
_____)

## UNITED STATES' MEMORANDUM IN SUPPORT OF
## MOTION TO ENTER CONSENT DECREE

COLM F. CONNOLLY
United States Attorney

PATRICIA C. HANNIGAN
Assistant United States Attorney
Delaware Bar I.D. No. 2145
The Nemours Building
1007 Orange Street, Suite 700
P. O. Box 2046
Wilmington, DE 19899-2046
(302) 573-6277

LESLIE ALLEN
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4114

Dated: May 9, 2008

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The Effects of Storm Water Runoff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  Brief Statutory Background and Alleged Violations . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.  Summary of Terms of Consent Decree . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.  Compliance Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           a.  Management Structure, Contractor Oversight,
                Qualifications, and Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           b.  Improved SWPPPs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           c.  Site Inspection, Remediation and Oversight . . . . . . . . . . . . . . . . . . . . . . . 8

           d.  Reporting and Consequences for Non-Compliance . . . . . . . . . . . . . . . . . 10

        2.  The Civil Penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3.  Covenant Not to Sue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.  The Consent Decree is Fair, Reasonable, and Consistent with the
        Objectives of the Clean Water Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.  The Consent Decree is Fair. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.  The Decree is Reasonable and in the Public Interest. . . . . . . . . . . . . . . . . . . 13

i

C.  The Comment is Late, and in any Event, Does Not Alter the
Appropriateness of the Decree.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES

**FEDERAL CASES**

Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . 12

City of New York v. Exxon Corp., 697 F. Supp. 677 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . 13

Comerica Bank-Detroit v. Allen Industries, Inc., 769 F. Supp. 1408 (E.D. Mich. 1991) . . . . . . 14

Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, 484 U.S. 49 (1987) . . . . . . . . . 17

In re Tutu Water Wells CERCLA Litigation, 326 F.3d 201 (3rd Cir. 2003) . . . . . . . . . . . . . 11, 12

Officers for Justice v. Civil Service Comm'n, 688 F.2d 615 (9th Cir. 1982) . . . . . . . . . . . . . . 16

Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc., 913 F.2d 64
(3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Akzo Coatings of America, Inc., 949 F.2d 1409 (6th Cir. 1991) . . . . . . . . . . 12,
13, 16

United States v. Atofina Chemicals, Inc., No. 01-7087, 2002 WL 1832825 (E.D. Pa. Aug. 5,
2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Cannons Eng'g Corp., 899 F.2d 79 (1st Cir.1990) . . . . . . . . . . . . . . . . . . . 11, 12

United States v. Cannons Eng'g Corp., 720 F. Supp. 1027 (D. Mass. 1989), aff'd, 899 F.2d 79
(1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. County of Muskegon, 298 F.3d 569 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 11

United States v. Hooker Chem. and Plastics Corp., 776 F.2d 410 (2d Cir. 1985) . . . . . . . . . . . 11

United States v. Jones & Laughlin Steel Corp., 804 F.2d 348 (6th Cir. 1986) . . . . . . . . . . . 11, 16

United States v. Key West Towers, Inc., 720 F. Supp. 963 (S.D. Fla. 1989) . . . . . . . . . . . . . . . 17

United States v. Larkins, 657 F. Supp. 76 (W.D. Ky. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Montrose Chemical Corp., 50 F.3d 741 (9th Cir. 1995) . . . . . . . . . . . . . . . 11, 12

United States v. Oregon, 913 F.2d 576 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Roll Coater, Inc., No. IP 89-828, 21 Envtl. L. Rep. 21073 (S.D. Ind. Mar. 22, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Smithfield Foods, Inc., 982 F. Supp. 373 (E.D. Va. 1997) . . . . . . . . . . . . . . . 17

United States v. Southeastern Pennsylvania Transp. Authority, 235 F.3d 817 (3rd Cir. 2000)   . 11

**FEDERAL STATUTES**

Clean Water Act, 33 U.S.C. §§ 1251 et seq. (Federal Water Pollution Control Act)

       Section 101(a), 33 U.S.C. § 1251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       Section 301, 33 U.S.C. § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       Section 308, 33 U.S.C. § 1318 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

       Section 309(b) and (d), 33 U.S.C. § 1319(b) and (d) . . . . . . . . . . . . . . . . . . . . . . . . . 4

       Section 402, 33 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

       Section 402, 33 U.S.C. § 1342(p) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Miscellaneous Receipts Act

       31 U.S.C. § 3302(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**FEDERAL REGULATIONS**

28 C.F.R. § 50.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

40 C.F.R. §122.26(c), (b)(14)(x), (b)(15) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

40 C.F.R. § 122.28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

73 Fed. Reg. 11953-02 (Mar. 5, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## EXHIBIT LIST

Exhibit A      EPA, National Water Quality Inventory: 2000 Report, page 13 (2002)

Exhibit B      Federal Construction General Permit (as modified, effective Jan. 21, 2005) (Excerpts)

Exhibit C      Letter dated 4/25/08 to the Court from Troostwood Neighborhood Assoc.

Exhibit D      <u>United States v. Atofina Chemicals, Inc</u>., No. 01-7087, 2002 WL 1832825 (E.D. Pa. Aug. 5, 2002)

Exhibit E      <u>United States v. Roll Coater, Inc</u>., No. IP 89-828 C, 21 Envtl. L. Rep. 21073, 21077-78 (S.D. Ind. Mar. 22, 1991)

## NATURE AND STAGE OF THE PROCEEDING

On February 26, 2008, the United States and State of Colorado filed a complaint against Defendant Home Depot USA, Inc. ("Home Depot") initiating this Clean Water Act case and, simultaneously, lodged a Consent Decree with the Court that, if entered, would entirely resolve this matter. In accordance with 28 C.F.R. § 50.7 and Paragraph 50 of the Decree, on March 5, 2008, the United States Department of Justice published notice of the lodging of the Decree in the Federal Register. 73 Fed. Reg. 11953-02 (Mar. 5, 2008). The notice described the principal terms of the settlement and provided an opportunity to comment on the Decree. The United States reserved the right to withdraw or withhold consent for the Decree if the comments disclose facts or considerations which indicate that the proposed judgment is inappropriate, improper or inadequate, Consent Decree ¶ 50; 28 C.F.R. § 50.7. The requisite time period for comments elapsed, and no comments were received on the proposed settlement during the comment period. However, one comment from a neighborhood association in Kansas City, MO, was sent belatedly and directly to the Court on April 25, 2008. The comment seeks $300,000 of the $1.3 million civil penalty for use by the neighborhood association.

## SUMMARY OF ARGUMENT

As shown below, notwithstanding the comment received, the settlement as negotiated and presented to the Court ably meets the standard for entry. It is fair, reasonable, consistent with the Clean Water Act, in the public interest, and should be entered. Accordingly, the United States, on behalf of the United States Environmental Protection Agency, respectfully moves this Court for entry of the proposed Consent Decree that was lodged with the Court in this action. All parties, including Defendant Home Depot, assent to this motion.

1

# I.    BACKGROUND

## A.    The Effects of Storm Water Runoff

The erosion and runoff that occur from construction sites can have significant impacts on the quality of our nation's waters. Sediment-laden runoff results in increased turbidity and decreased oxygen in a stream, which in turn results in loss of in-stream habitat for fish and other aquatic species. Such runoff can also kill fish directly, destroy spawning beds, and suffocate fish eggs and bottom dwelling organisms. Moreover, this runoff can increase difficulty in filtering drinking water, resulting in higher treatment costs, and can result in the loss of drinking water reservoir storage capacity and decrease the navigational capacity of waterways. *See, e.g.,* *National Water Quality Inventory: 2000 Report*, page 13 (2002) (Exhibit A).

## B.    Brief Statutory Background and Alleged Violations

Under the Clean Water Act, discharges of storm water "associated with industrial activity," including construction activity that disturbs at least one acre of land, require a permit under the National Pollutant Discharge Elimination System ("NPDES"). *See* 33 U.S.C. § 1342; 40 C.F.R. §122.26(c), (b)(14)(x), (b)(15). Under general NPDES permits issued by EPA or authorized states, an owner or operator of a construction site ("permittee") must obtain coverage by submitting a notice to the appropriate agency and design a plan (known as the Storm Water Pollution Prevention Plan, or "SWPPP") to control storm water runoff from the construction site. 40 C.F.R. § 122.28. SWPPPs set forth a description of the site and the construction activity to occur there, as well as provide a plan for minimizing and eliminating to the extent feasible discharges of pollutants in storm water associated with those activities. *See, e.g.,* Federal Construction General Permit (as modified, effective Jan. 21, 2005) ("Federal CGP,"), Parts

2

3.1.B.2 and 3.4.A.[1]  The SWPPP must meet specific requirements and include certain information.  In addition, the permittee must install, maintain, and inspect erosion and sediment controls known as Best Management Practices ("BMPs"), which comprise practices, equipment, and measures to prevent the discharge of pollutants.  BMPs typically are low cost physical measures such as silt fences around the perimeter of disturbed areas and straw bales over storm drains and practices such as phasing of construction schedules to minimize the amount of time that the soil at the site will be unstable.  The permittee must implement the SWPPP, properly operate and maintain the BMPs, and improve the BMPs if they are not adequate.  Federal CGP, Parts 3.1.D and 3.6.A, 3.11.B.  The permits impose additional requirements, including, *inter alia*: inspection of the site during construction, Federal CGP, Part 3.10; maintenance of the SWPPP and sometimes other records at the site, Federal CGP, Part 3.12; and final stabilization of the site followed by termination of permit coverage, Federal CGP, Part 5.1.A.

As part of a national initiative to address construction storm water violations at major construction sites, in 2000-2003, EPA (or its contractor or the relevant state) performed 15 inspections at various Home Depot stores in 7 states around the country.  EPA followed up with information requests under Section 308 of the Act, 33 U.S.C. § 1318, and obtained information on additional Home Depot construction sites.

As alleged in the complaint, at four sites, Home Depot never applied for permit coverage at all during the six month or more construction process.  At eight other sites, Home Depot applied for permit coverage late – after construction had already begun.  Through inspections

---

[1]  Cited portions of the CGP are attached as Exhibit B.  The entire CGP is available on EPA's website at http://cfpub.epa.gov/npdes/stormwater/cgp.cfm.

and/or responses to Section 308 information requests, EPA found a pattern of failure to comply with permit requirements, including, among others, failure to install and maintain storm water controls (such as a vehicle track out pad, inlet protection, silt fencing to minimize off-site sediment and erosion runoff); failure to properly design or implement BMPs; failure to prepare an adequate SWPPP; failure to conduct inspections; and failure to conduct inspections in accordance with the permit requirements.

Based on the gathered evidence, on February 26, 2008, the United States filed a complaint against Home Depot alleging violations of the construction storm water requirements of the Clean Water Act, its regulations, and applicable permits at numerous Home Depot construction sites in numerous states across the country.[2]  Specifically, the complaint sought injunctive relief and civil penalties pursuant to the Clean Water Act, 33 U.S.C. § 1319(b) and (d), for the discharge of pollutants in storm water without a permit in violation of 33 U.S.C. § 1311; for failing to provide information to EPA as needed to carry out the objectives of the Clean Water Act, including the NPDES permit program, in violation of 33 U.S.C. § 1318; and for violations of the conditions of permits issued pursuant to 33 U.S.C. § 1342 for discharge of pollutants in storm water from construction sites in violation of 33 U.S.C. § 1311.  The State of Colorado joined the complaint and alleged similar violations of the Colorado Water Quality Control Act, §§ 25-8-607 and -608, C.R.S.

**C.     Summary of Terms of Consent Decree**

The Consent Decree, lodged simultaneously with the Complaint, represents the

---

[2] Home Depot neither admits nor denies the allegations in the complaint.  *See* Consent Decree, p. 1, ¶ C.

culmination of months of negotiations to resolve the allegations in the Complaint and resolves all the matters pending in this case. The Consent Decree requires Home Depot to implement a comprehensive, corporate-wide program to prevent storm water pollution at each new store it builds nationwide for a period of five years.

1.    Compliance Program

As an initial matter, the Decree requires Home Depot to comply with the Clean Water Act and the general permits, *see, e.g.*, Consent Decree ¶¶ 2, 8, 23.h[3], but many of the injunctive relief provisions of the Decree go well beyond the requirements of the applicable permits. There are several components to the compliance program, including: a) management structure, oversight of contractors, qualifications, and training; b) improved SWPPPs; c) site inspection, remediation, and internal oversight; and d) reporting and consequences for non-compliance.

a.    Management Structure, Contractor Oversight, Qualifications, and Training

The Decree ensures that Home Depot has general contractor personnel who have been properly trained at each site and qualified personnel within Home Depot's management structure to oversee storm water compliance at all sites.

First, Home Depot must appoint a Storm Water Coordinator who, among other qualifications, must have at least five years of construction-related experience and be a trained "Storm Water Professional." ¶ 4. Home Depot's Storm Water Coordinator is a Home Depot employee of at least the Director level, oversees the work of Home Depot's other Storm Water Managers, and is responsible for coordinating oversight of construction storm water compliance

---

[3] Except as otherwise noted, all paragraph references (¶) in this brief are to the Consent Decree.

by Home Depot and its general contractors at all sites. Home Depot's mid-level "Storm Water Managers" (Regional Directors of Construction and Construction Managers) and Project Managers (who are assigned to oversee particular sites and are primarily responsible for storm water compliance, including inspections, at their sites), must also be experienced Storm Water Professionals. ¶ 5. Home Depot may use a qualified Storm Water Consultant to perform certain functions under the Decree, including inspections, and, generally, the Project Manager is responsible for overseeing performance of these activities. ¶ 6.

The Decree also contains provisions to improve Home Depot's oversight of its general contractor and to improve contractor performance relative to storm water. To make sure that contractors bidding on construction projects are aware of the requirements they must meet, Home Depot is required to ensure that all bidding parties have a copy of the Decree before the submission of bids. ¶ 7. In addition, as part of the construction contract for any site, Home Depot must obtain a written acknowledgment from the general contractor that it is aware of and will comply with certain enumerated storm water requirements (including putting all BMPs in place correctly prior to commencement of construction, and inspecting the site to confirm this), ¶¶ 15, 19, and must certify to Home Depot that these and certain other requirements have been met prior to commencement of construction. ¶ 20. Home Depot must also hold a conference with the general contractor to review storm water requirements prior to the initiation of construction. ¶ 21. App. B. Further, Home Depot must ensure that its Storm Water Coordinator contact information, the permit, the SWPPP, and appropriate guidance materials are all readily available on site. ¶¶ 12-14.

Home Depot must also ensure that its contractors have qualified individuals at its Sites. Home Depot must require its general contractor to have a Compliance Officer assigned to each site, and both the Compliance Officer and Project Superintendent for the site must, among other things, be an experienced Storm Water Professional. ¶¶16-17. Further, the Project Superintendent must provide a pre-construction site-specific briefing to all of its employees and subcontractors involved in ground disturbing activities and their employees concerning the SWPPP, the storm water compliance requirements for the site, and the consequences of non-compliance. ¶ 18. Subcontractors and their employees who are not involved in ground-disturbing activities (*e.g.*, paint and stucco contractors) must still receive a briefing on certain compliance issues, such as the basics of erosion control, and specific practices to which they should adhere to minimize pollutants leaving the site. *Id*. In addition, the Project Superintendent must meet with its employees and subcontractors weekly to review the storm water requirements of the permit, the SWPPP, and the Decree, and to address any problems that have arisen in implementing the SWPPP or maintaining BMPs. ¶ 22.

Finally, Home Depot developed a storm water training program to certify personnel as Storm Water Professionals. ¶ 28, App. E. The required syllabus was developed with EPA and is attached to the Decree, and the training program conforms to the syllabus. Certification requires passing a written test to determine proficiency with the principles, practices, and regulatory requirements of erosion and sediment control and other storm water requirements. To remain certified, personnel must repeat the training and testing annually.

          b.    <u>Improved SWPPPs</u>

The Decree contains requirements relating to SWPPPs, including that they be prepared by

7

qualified personnel, that there be a site visit prior to developing the SWPPP, and a descriptive list of elements that the SWPPP must include. ¶ 9. The Decree also has specific requirements and time frames for updating SWPPPs. ¶ 11. Both of these elements are more descriptive than and go beyond many permits.

c.    <u>Site Inspection, Remediation and Oversight</u>

The Decree includes inspection, remediation, and reporting requirements that also go beyond many applicable permit requirements in an attempt to ensure that storm water problems are promptly identified and corrected, and that the Home Depot Storm Water Coordinator and other managers are kept apprised of compliance status to enable their prompt response to any problems.

Home Depot must require its General Contractor's Project Superintendent to inspect the site weekly and within 24 hours of rain. ¶ 23.a. The Decree specifies inspection requirements and includes a detailed inspection form, which must be filled out and certified. ¶ 23.b, App. C. Home Depot must require its General Contractor to ensure that all "Action Items" (any action required to be taken to achieve or maintain compliance with storm water requirements) be remediated as soon as possible, and for BMP problems, before the next rain. Action Items and their remediation must be noted on an Action Item Log. ¶ 23.c.

Both the General Contractor Compliance Officer and the Home Depot Project Manager or consultant ("Home Depot Inspector") must perform monthly oversight inspections so that, together, the oversight inspections happen approximately bi-weekly. ¶ 23.d, .e. These inspectors must perform their own inspections and also review the results of the prior inspections and Action Item Log to ensure that inspections were performed and documented correctly and that all

8

Action Items were timely and appropriately fixed. *Id.* If not, Home Depot must require the General Contractor to fix any outstanding problems and document the actions taken. ¶ 23.d. The Compliance Officer and the Home Depot Inspector must also generally discuss any inadequacies in performance with the Project Superintendent. ¶ 23.d, .e. The Home Depot Inspector must also document other "qualitative" findings on his or her inspection report, such as any changes in procedures that are deemed necessary to ensure compliance, any recurring deficiencies, etc., must discuss these with the General Contractor, and record them for followup. ¶ 23.e(I).

The Home Depot Inspector's first inspection must occur within one week of commencement of construction. During this inspection, the inspector must not only perform a routine inspection, but must also confirm that all of the items that the General Contractor certified as having been performed prior to beginning instruction have in fact been appropriately performed, including the proper installation of all necessary BMPs. ¶ 23.e(ii).

Home Depot must also perform a final inspection of the site at the conclusion of construction to ensure that the site has been stabilized in accordance with permit requirements, and that all other requirements have been met for termination of permit coverage. ¶ 27.

The Decree requires Home Depot to collate the results of all the weekly and oversight inspections and Action Item Logs into a weekly compliance report for all Home Depot sites. This report is sent to the Storm Water Coordinator and all the Storm Water Managers before Friday of the week following the inspections. ¶ 23.g. This ensures that Home Depot management, up to the Storm Water Coordinator, who is at the Director level, will be aware of any site deficiencies and can work to achieve prompt compliance.

d.    <u>Reporting and Consequences for Non-Compliance</u>

In order to allow EPA to oversee Home Depot's compliance with the Decree, Home Depot must submit quarterly compliance reports, which must be reviewed and certified by the Storm Water Coordinator. ¶ 25. Among other things, the report must identify any apparent violations by Home Depot or its General Contractor, include a copy of any government inspection reports or enforcement documents, and discuss any compliance problems and steps Home Depot plans to take to address them. Annually, the report must evaluate and report on the training program.

In addition to the quarterly report, Home Depot must send EPA a monthly report of Sites that are currently in existence. ¶ 3. This allows EPA to spot-check Home Depot's compliance with the Decree and the permits.

The final group of requirements under the Decree consists of the consequences for failure to meet the requirements of the Decree. The Decree imposes stipulated penalties for the violation of its requirements and imposes increased contractor oversight provisions for certain non-compliance. Paragraph 24 provides that if a notice of violation or other state or federal enforcement action is initiated for inspection or BMP-related violations at a site, or if Home Depot itself determines that a contractor has had three or more BMP or inspection-related violations at a site, Home Depot has to perform an unannounced inspection at the site and submit a plan to EPA for increased inspection and oversight to bring the site into compliance.

2.    <u>The Civil Penalty</u>

The Decree requires Home Depot to pay a civil penalty of $1.3 million, approximately $30,500 of which is to be paid to Colorado.

10

3.     Covenant Not to Sue

In consideration of the civil penalty payment and the compliance program, the Plaintiffs

covenant not to sue for the violations alleged in the complaint through the date of lodging.

Finally, the Decree provides that stipulated penalties are not the Plaintiffs' exclusive remedies for

violations of the Decree, and that Plaintiffs reserve all rights to pursue Home Depot for any other

violations except those specifically resolved by the Decree.  ¶¶ 57, 67.

## II.  ARGUMENT

### A.  Standard of Review

The approval of a consent decree is within the discretion of the district court.  United

States v. Cannons Eng'g Corp., 720 F. Supp. 1027, 1035 (D. Mass. 1989), aff'd 899 F.2d 79 (1st

Cir. 1990); United States v. Hooker Chem. and Plastics Corp., 776 F.2d 410, 411 (2d Cir. 1985).

In this Circuit, as in others, a court must review the proposed consent judgment to determine

whether it represents a resolution that is "fair, reasonable, and consistent with . . . [the statute's]

goals." In re Tutu Water Wells CERCLA Litigation, 326 F.3d 201, 207 (3rd Cir. 2003).[4]  The

last of these three requirements is sometimes phrased as a finding that the settlement is

"consistent with the public interest."  See United States v. County of Muskegon, 298 F.3d 569,

580-81 (6th Cir. 2002) (quoting United States v. Jones & Laughlin Steel Corp., 804 F.2d 348,

---

[4] *See also, e.g.*,  United States v. Southeastern Pennsylvania Transp. Authority, 235 F.3d 817,
824 (3rd Cir. 2000) (court should approve proposed consent decree if it is fair, reasonable, and
consistent with CERCLA's goals.); United States v. Montrose Chemical Corp., 50 F.3d 741, 746-
47 (9th Cir. 1995); United States v. Cannons Eng'g Corp., 899 F.2d 79, 85 (1st Cir.1990)
("Reasonableness, fairness, and fidelity to the statute are, therefore, the horses which district
judges must ride."); United States v. Oregon, 913 F.2d 576, 580 (9th Cir. 1990) (district court
approval of consent decree requires that decree be fundamentally fair, reasonable, and consistent
with applicable laws).

351 (6th Cir.1986)) (district court must review proposed Clean Water Act consent decree to determine whether it represents a resolution that is fair, reasonable and consistent with the public interest).

Voluntary settlement of legal disputes is favored by the courts and is generally perceived to be in the public interest. *See* Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983). There is a strong presumption that the agencies are acting in the public's interest when the Department of Justice negotiates a settlement on behalf of the EPA in the environmental field, which requires special expertise. United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1426 (6th Cir. 1991). In determining whether a consent judgment is fair, reasonable, and adequate to protect the public interest, the court must not rubberstamp the agreement, but also must not substitute its own judgment for that of the parties to the decree. *Id.* at 1435 (citations omitted); *accord* In re Tutu Water Wells CERCLA Litig., 326 F.3d 201, 207 (3d Cir. 2003).

### B.    The Consent Decree is Fair, Reasonable, and Consistent with the Objectives of the Clean Water Act.

#### 1. The Consent Decree is Fair.

First, the Consent Decree is the result of a fair negotiation process between Home Depot, the United States, and Colorado. All parties were represented by experienced counsel at all stages in the proceedings and discussed settlement proposals amongst each other voluntarily. The Consent Decree was not built in a day, but rather was the result of significant good faith, "arms length" negotiations, with concessions made on both sides of the table.[5]

---

[5]    *See, e.g.*, Montrose, 50 F.3d at 746 (deference given to "affected parties . . . represented by experienced lawyers [who] have hammered out an agreement at arm's length and advocate its

2.  The Decree is Reasonable and in the Public Interest.

In this case, the analysis of whether the Decree is "reasonable" and whether it is consistent with the Clean Water Act's goals and in the public interest is very similar.  The most important criterion for the Court to consider in determining whether the Decree is "reasonable" is its "likely effectiveness as a vehicle for cleansing the [environment] . . . ." Akzo, 949 F.2d at 1437.  The express objective of the Clean Water Act is to restore and maintain the chemical, physical, and biological integrity of the waters of the United States. 33 U.S.C. § 1251(a).  One of the specific requirements implementing this objective is the control of pollutants in storm water. 33 U.S.C. § 1342(p).

As demonstrated above, the proposed Consent Decree is reasonable, comports with the objectives of the Act and furthers the public interest by providing for a compliance program that will improve the control of discharges of sediment from all of Home Depot's future construction sites, thereby addressing an important factor in the degradation of the nation's waters.  As discussed at length above, the Decree includes numerous specific requirements to achieve this compliance at each Home Depot site and company-wide, with significant consequences for non-compliance.  Further, the Decree's site requirements apply to all sites for which a construction contract is let after entry, ¶ 1 (definition of "Site"), and some of the Decree's requirements, such as designation of the Storm Water Coordinator and training of Home Depot's managers run from

---

embodiment in a judicial decree"); Cannons, 899 F.2d at 87 (fact decree negotiated at arm's length among experienced counsel, and that the agency operated in good faith supports finding of procedural fairness); Comerica Bank-Detroit v. Allen Industries, Inc., 769 F. Supp. 1408, 1412 (E.D. Mich. 1991) (arms length bargaining among parties provides presumptive favor for a settlement); City of New York v. Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y. 1988).  See also Akzo, 949 F.2d at 1435 (good faith efforts of the parties indicated by arms-length negotiation process).

13

lodging of the Decree.  ¶¶ 4, 5(c).

Moreover, the Consent Decree recognizes that Home Depot operates in all fifty states and that many of those states have their own general permits.  For example, the Consent Decree provides an inspection and remediation program that applies nation-wide, but Home Depot retains the obligation to ensure that in each state it is complying with the requirements of the State's particular program (*id.* ¶¶ 2, 23(h)).  Thus, for example, the Decree requires its general contractor to inspect at least weekly and within 24 hours of rain, *id.* ¶ 23.a, with bi-weekly oversight inspections by Home Depot or the General Contractor's Compliance Officer.  If an applicable permit is less stringent than this, the Decree's inspection regime would apply.  In a few states that have certain more stringent inspection requirements (*e.g.*, a requirement to inspect daily during rain events), these would apply.  In other words, the Consent Decree establishes a minimum storm water program for a nationwide company that will greatly facilitate compliance with the various requirements of the permits applicable to Home Depot construction sites in all fifty states.

Further, the Consent Decree comports with the Clean Water Act because it requires a civil penalty appropriate to the violations, thereby deterring both this Defendant and other individuals in the regulated community from future violations of storm water requirements.  Finally, the settlement is in the public interest because it represents a voluntary settlement of a potentially complex legal action, thereby reducing the burden on the Courts and the litigants.

C.     **The Comment is Late, and in any Event, Does Not Alter the Appropriateness of the Decree.**

The United States received no comments on the Decree during the public comment

period. On April 25, 2008, the Troostwood Neighborhood Association ("TNA"), sent a letter

directly to the Court that did not challenge the entry of the Decree but asked the Court to give

$300,000 of the $1.3 million penalty[6] that Home Depot is required to pay to the TNA for use on

storm water reduction and other environmentally beneficial projects in the Kansas City, Missouri

neighborhood. *See* Exhibit C. First, this request is untimely and could be ignored on that ground

alone. More importantly though, as discussed below, this Court cannot modify the parties'

agreement. It can only approve or reject the settlement negotiated by the parties, and the request

by TNA for a portion of the civil penalty provides no basis to reject the settlement. As shown

above, the consent decree includes a comprehensive program to bring all Home Depot sites

across the country into compliance with storm water requirements and includes a significant civil

penalty, consistent with the goals of the Clean Water Act's penalty provisions. The Consent

Decree, as written, is fair, reasonable, in the public interest, and should be approved.

"Supplemental environmental projects" ("SEPs") can be a component of an appropriate

Clean Water Act settlement. A SEP is an environmentally beneficial project that a defendant

agrees to undertake in settlement of an enforcement action, but that the defendant is not

otherwise legally required to perform. *See* EPA Supplemental Environmental Projects Policy

(May 1, 1998) ("SEP Policy"), 63 Fed. Reg. 24796, 24797-98 (1998). In settlement, the United

States can, in determining the appropriate amount for which to settle a penalty claim, take into

consideration the fact that a defendant has agreed to perform or fund certain restoration or other

environmental projects. However, the United States' decision to include a SEP in a settlement is

---

[6] The Decree requires Home Depot to pay $1,269,531 to the United States and the remaining
$30,469 of the civil penalty to Colorado. ¶ 31.

within the discretion of the United States, *see, e.g.*, SEP Policy, 63 Fed. Reg. at 24797 (decision

to accept SEP is "purely within EPA's discretion"), subject of course, to the parties' ability to

negotiate an acceptable agreement.  Here, the settlement entered into by the United States,

Colorado, and Home Depot does not include a SEP.

Even if this Court believes that the residents of the Troostwood Neighborhood would

benefit from monies for environmental projects (or that some other project might be

environmentally beneficial), this Court does not have the power to modify this settlement.  It may

only accept or reject the terms to which the parties have agreed.  Jones & Laughlin Steel Corp.,

804 F.2d at 351; Akzo Coatings of America, 949 F.2d at 1435; Officers for Justice v. Civil

Service Comm'n, 688 F.2d 615, 630 (9th Cir. 1982).  Further the role of this Court is not to

determine "whether the settlement is one which the Court itself might have fashioned, or

considers ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives

of the governing statute"); see also Officers for Justice, 688 F.2d at 625, 630.

In United States v. Atofina Chemicals, Inc., No. 01-7087, 2002 WL 1832825 (E.D. Pa.

Aug. 5, 2002)(attached hereto as Exhibit D), the district court was asked to enter a consent decree

that *did* include SEPs, over citizen group objections that community members had not been

included in the selection of the SEPs and that different SEPs would have been better.  However,

the court acknowledged that:

> it lacks the power to modify the consent decree by striking the SEP and leaving
> the rest of the agreement intact.  Given the choice of rejecting or accepting the
> agreement as written, the public interest is served by entering the consent decree.

*Id.* at *6.  Here, similarly, the Court does not have the power to change the settlement to require

Home Depot to perform a SEP in the Troostwood neighborhood or to require Home Depot to

16

fund TNA's activities, and the public interest would not be served by the Court's rejection of the

Decree and the concomitant delay in compliance and expenditure of resources for renegotiation

of the settlement or litigation.[7]

## III.    CONCLUSION

In conclusion, the proposed Consent Decree, as negotiated by the parties and lodged with

this Court, ably meets the standards for its entry, and the United States respectfully moves this

Court to enter it.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

---

[7] Nor does the Court have the authority to approve the Decree and subsequently divert civil penalty money from the Treasury to the TNA.  First, of course, this would be impermissibly changing the terms of the settlement.  Secondly, once civil penalties have been assessed by the court through judgment or entry of settlement, they must go to the Treasury because of the Miscellaneous Receipts Act, which requires that a "person having custody or possession of public money . . . shall deposit the money without delay in the Treasury . . . ." 31 U.S.C. § 3302(c)(1).  *See, e.g.*, Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, 484 U.S. 49, 53 (1987) (in citizen suit, court may "impose civil penalties payable to the United States Treasury."); Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 81-82 (3d Cir. 1990) (Congress intended that any penalties assessed in a citizen suit be treated as "miscellaneous receipts;" appropriate to pay the penalties into the Treasury because the citizens were acting as private attorneys general, standing in the stead of the United States.); United States v. Smithfield Foods, Inc., 982 F. Supp. 373, 376 (E.D. Va. 1997) ("[I]t is not the court's role to legislate, but rather to enforce the law Congress has passed. . . . [O]nce a penalty has been assessed by the court, the penalty must be paid into the Treasury."); United States v. Roll Coater, Inc., No. IP 89-828 C, 21 Envtl. L. Rep. 21073, 21077-78 (S.D. Ind. Mar. 22, 1991)("[O]nce labeled as a civil penalty, the money must be paid to the Treasury.") (attached hereto as Exhibit E).  *But see* United States v. Key West Towers, Inc., 720 F. Supp. 963 (S.D. Fla. 1989); United States v. Larkins, 657 F. Supp. 76, 87 (W.D. Ky. 1987) (entering decrees over the objection of the United States and without addressing the Miscellaneous Receipts Act).

s/Leslie Allen
Leslie Allen
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4114
leslie.allen@usdoj.gov


COLM F. CONNOLLY
United States Attorney


By:    /s/Patricia C. Hannigan
Patricia C. Hannigan
Assistant United States Attorney
Delaware Bar I.D. No. 2145
The Nemours Building
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE  19899-2046
(302) 573-6277
patricia.hannigan@usdoj.gov


OF COUNSEL:

KELLY BRANTNER
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W
MC 2243A Room 3120A
Washington, DC 20460
202-564-9933

# Exhibit A



# National Water Quality Inventory

## 2000 Report

miles and 31% of the impaired river and stream miles). Siltation alters aquatic habitat, suffocates fish eggs and bottom-dwelling organisms, and can interfere with drinking water treatment processes and recreational use of a river (see Figure 2-6). Sources of siltation include agriculture, urban runoff, construction, and forestry.

Alteration to river and stream habitats was reported by the states and tribes to cause impairment to 58,807 miles (8% of the assessed river and stream miles and 22% of the impaired river and stream miles). In this case, only habitat alterations that do not affect water flow are considered because states and tribes report stream flow alterations (such as dams

and irrigation) under a different category. Habitat alterations that do not directly affect stream flow, such as the removal of woody debris or stream bottom cobblestones, can adversely affect aquatic organisms whose health and abundance depend on specific physical and environmental conditions. (For example, small organisms such as young fish use submerged logs to gain protection from predators.) Habitat modifications result from human activities such as flow regulation, logging, and land-clearing practices.

In addition to siltation, bacteria, and nonflow habitat alterations, the states and tribes also reported oxygen-depleting substances, nutrients, thermal modifications, metals, and flow alterations as leading stressors. Often, several pollutants and stressors adversely affect a single river segment. For this reason, the river and stream miles impaired by each pollutant or stressor do not add up to 100% in Figure 2-4.

## Sources of Pollutants Impacting Rivers and Streams

A total of 55 tribes and states reported sources of pollution related to human activities that impact some of their rivers and streams (see Appendix A, Table A-5, for individual state and tribal information). The most commonly reported sources include agriculture, hydrologic modifications, and habitat modifications.

Agriculture is listed as a source of pollution for 128,859 river and stream miles (18% of assessed river and stream miles, 48% of impaired river and stream miles) (Figure 2-5). For the 30 states and tribes that reported the number of river and stream miles affected by specific types of agricultural activities, the most common types are: nonirrigated crop production (degrades 26,830 miles), animal feeding operations (degrades

**Figure 2-4**

### Leading POLLUTANTS in Impaired Rivers and Streams





States assessed 19% of the total miles of rivers and streams for the 2000 report. The larger pie chart on the left illustrates this proportion. The smaller pie chart on the right shows that, for the subset of assessed waters, 61% are rated as good and 39% as impaired. When states identify waters that are impaired, they describe the pollutants or processes causing or contributing to the impairment. The bar chart presents the leading causes and the number of river and stream miles impacted. The percent scales on the upper and lower x-axes of the bar chart provide different perspectives on the magnitude of the impact of these pollutants. The lower axis compares the miles impacted by the pollutant to the total ASSESSED miles. The upper axis compares the miles impacted by the pollutant to the total IMPAIRED miles.

Based on data contained in Appendix A, Table A-4.

*Includes miles assessed as not attainable.

Note:  Percentages do not add up to 100% because more than one pollutant or source may impair a river segment.

# Exhibit B

**NPDES General Permit for Storm Water Discharges From Construction Activities**

**Table of Contents**                    **As modified effective January 21, 2005**

COVER PAGE ................................................................................................................1

**PART 1: COVERAGE UNDER THIS PERMIT** ......................................................................2
1.1  Introduction ...................................................................................................... 2
1.2  Permit Area ...................................................................................................... 2
1.3  Eligibility .......................................................................................................... 2
1.4  Waivers for Certain Small Construction Activities ............................................ 5

**PART 2: AUTHORIZATION FOR DISCHARGES OF STORM WATER FROM CONSTRUCTION ACTIVITY** ......5
2.1  Authorization to Discharge Date ...................................................................... 5
2.2  Notice of Intent Contents ................................................................................. 5
2.3  Submission Deadlines ...................................................................................... 6
2.4  Where to Submit ............................................................................................... 7

**PART 3: STORM WATER POLLUTION PREVENTION PLANS (SWPPPS)** ..........................7
3.1  Storm Water Pollution Prevention Plan Framework .......................................... 7
3.2  Requirements for Different Types of Operators ................................................ 7
3.3  Pollution Prevention Plan Contents: Site and Activity Description .................... 8
3.4  Pollution Prevention Plan Contents: Controls to Reduce Pollutants ................ 9
3.5  Non-Storm Water Discharge Management ........................................................ 9
3.6  Maintenance of Controls .................................................................................. 9
3.7  Documentation of Permit Eligibility Related to Endangered Species ............... 10
3.8  Copy of Permit Requirements ........................................................................... 10
3.9  Applicable State, Tribal, or Local Programs ..................................................... 10
3.10 Inspections ....................................................................................................... 10
3.11 Maintaining an Updated Plan ............................................................................ 11
3.12 Signature, Plan Review and Making Plans Available ......................................... 12
3.13 Management Practices ....................................................................................... 12
3.14 Documentation of Permit Eligibility Related to Total Maximum Daily Loads ...... 13

**PART 4: SPECIAL CONDITIONS, MANAGEMENT PRACTICES AND OTHER NON-NUMERIC LIMITATIONS** ......13
4.1  Continuation of the Expired General Permit ...................................................... 13
4.2  Requiring an Individual Permit or an Alternative General Permit ....................... 14
4.3  Releases in Excess of Reportable Quantities ................................................... 14
4.4  Spills ................................................................................................................. 14
4.5  Attainment of Water Quality Standards After Authorization ............................... 15

**PART 5: TERMINATION OF COVERAGE** ......................................................................15
5.1  Requirements ..................................................................................................... 15
5.2  Submitting a Notice of Termination ................................................................... 15
5.3  Where to Submit ................................................................................................ 16

**PART 6: RETENTION OF RECORDS** .............................................................................16

**PART 7: REOPENER CLAUSE** ........................................................................................................**16**

    7.1    Procedures for Modification or Revocation ................................................... 16

    7.2    Water Quality Protection ............................................................................. 16

    7.3    Timing of Permit Modification ....................................................................... 16

**PART 8: STANDARD PERMIT CONDITIONS**................................................................................**16**

**PART 9: PERMIT CONDITIONS APPLICABLE TO SPECIFIC STATES, INDIAN COUNTRY, OR
    TERRITORIES** ........................................................................................................**16**

## APPENDICES

Appendix A - Definitions and Acronyms ............................................................................. A-1

Appendix B - Permit Areas Eligible for Coverage.............................................................. B-1

Appendix C - Endangered Species Act Review Procedures............................................... C-1

Appendix D - Small Construction Waivers and Instructions................................................ D-1

Appendix E - Notice of Intent Form and Instructions.......................................................... E-1

Appendix F - Notice of Termination Form and Instructions................................................ F-1

Appendix G - Standard Permit Conditions ......................................................................... G-1

D. *Late Notifications:* Operators are not prohibited from submitting NOIs after initiating clearing, grading, excavation activities, or other construction activities. When a late NOI is submitted, authorization for discharges occurs consistent with Subpart 2.1. The Agency reserves the right to take enforcement action for any unpermitted discharges that occur between the commencement of construction and discharge authorization.

## 2.4   Where to Submit

A. Except as noted in Subpart 2.3.B, you must send your complete and accurate NOI to EPA at one of the following addresses:

| For Regular U.S. Mail Delivery: | For Overnight/Express Mail Delivery: |
|---|---|
| EPA Storm Water Notice Processing Center | EPA Storm Water Notice Processing Center |
| Mail Code 4203M | Room 7420 |
| U.S. EPA | U.S. EPA |
| 1200 Pennsylvania Avenue, NW | 1201 Constitution Avenue, NW |
| Washington, DC 20460 | Washington, DC 20004 |

B. In lieu of Subpart 2.4.A, when available, you may submit your NOI using EPA's electronic NOI system (i.e., eNOI) as detailed at www.epa.gov/npdes/stormwater/cgp.

## PART 3: STORM WATER POLLUTION PREVENTION PLANS (SWPPPS)

### 3.1   Storm Water Pollution Prevention Plan Framework

A. A SWPPP must be prepared prior to submission of an NOI as required in Part 2. At least one SWPPP must be developed for each construction project covered by this permit and such SWPPP must be prepared in accordance with good engineering practices.

B. The SWPPP must:

1. Identify all potential sources of pollution which may reasonably be expected to affect the quality of storm water discharges from the construction site;

2. Describe practices to be used to reduce pollutants in storm water discharges from the construction site; and

3. Assure compliance with the terms and conditions of this permit.

C. Once a definable area has been finally stabilized, you may mark this on your SWPPP and no further SWPPP or inspection requirements apply to that portion of the site (e.g., earth-disturbing activities around one of three buildings in a complex are done and the area is finally stabilized, one mile of a roadway or pipeline project is done and finally stabilized, etc).

D. You must implement the SWPPP as written from commencement of construction activity until final stabilization is complete.

### 3.2   Requirements for Different Types of Operators

You may meet one or both of the operational control components in the definition of operator found in Appendix A. Subpart 3.2.C applies to all permittees having control over only a portion of a construction site.

A. If you have operational control over construction plans and specifications, you must ensure that:

1. The project specifications meet the minimum requirements of this Subpart and all other applicable permit conditions;

2. The SWPPP indicates the areas of the project where the operator has operational control over project specifications, including the ability to make modifications in specifications;

3. All other permittees implementing portions of the SWPPP (or their own SWPPP) who may be impacted by a change to the construction plan are notified of such changes in a timely manner; and

4. The SWPPP indicates the name of the party(ies) with day-to-day operational control of those activities necessary to ensure compliance with the SWPPP or other permit conditions.

B.  If you have operational control over day-to-day activities, you must ensure that:

   1.  The SWPPP meets the minimum requirements of this Subpart and identifies the parties responsible for implementation of control measures identified in the plan;

   2.  The SWPPP indicates areas of the project where you have operational control over day-to-day activities;

   3.  The SWPPP indicates the name of the party(ies) with operational control over project specifications (including the ability to make modifications in specifications).

C.  If you have operational control over only a portion of a larger project (e.g., one of four homebuilders in a subdivision), you are responsible for compliance with all applicable terms and conditions of this permit as it relates to your activities on your portion of the construction site, including protection of endangered species, critical habitat, and historic properties, and implementation of best management practices (BMPs) and other controls required by the SWPPP. You must ensure either directly or through coordination with other permittees, that your activities do not render another party's pollution control ineffective. You must either implement your portion of a common SWPPP or develop and implement your own SWPPP.

   For more effective coordination of BMPs and opportunities for cost sharing, a cooperative effort by the different operators at a site to prepare and participate in a comprehensive SWPPP is encouraged. Individual operators at a site may, but are not required to, develop separate SWPPPs that cover only their portion of the project provided reference is made to other operators at the site. In instances where there is more than one SWPPP for a site, cooperation between the permittees is encouraged to ensure the storm water discharge controls and other measures are consistent with one another (e.g., provisions to protect listed species and critical habitat).

### 3.3    Pollution Prevention Plan Contents: Site and Activity Description

A.  The SWPPP must identify all operators for the project site, and the areas of the site over which each operator has control.

B.  The SWPPP must describe the nature of the construction activity, including:

   1.  The function of the project (e.g., low density residential, shopping mall, highway, etc.);

   2.  The intended sequence and timing of activities that disturb soils at the site;

   3.  Estimates of the total area expected to be disturbed by excavation, grading, or other construction activities, including dedicated off-site borrow and fill areas; and

   4.  A general location map (e.g., USGS quadrangle map, a portion of a city or county map, or other map) with enough detail to identify the location of the construction site and waters of the United States within one mile of the site.

C.  The SWPPP must contain a legible site map, showing the entire site, identifying:

   1.  Direction(s) of storm water flow and approximate slopes anticipated after major grading activities;

   2.  Areas of soil disturbance and areas that will not be disturbed;

   3.  Locations of major structural and nonstructural BMPs identified in the SWPPP;

   4.  Locations where stabilization practices are expected to occur;

   5.  Locations of off-site material, waste, borrow or equipment storage areas;

   6.  Locations of all waters of the United States (including wetlands);

   7.  Locations where storm water discharges to a surface water; and

   8.  Areas where final stabilization has been accomplished and no further construction-phase permit requirements apply.

D.  The SWPPP must describe and identify the location and description of any storm water discharge associated with industrial activity other than construction at the site. This includes storm water discharges from dedicated asphalt plants and dedicated concrete plants, that are covered by this permit.

**3.4    Pollution Prevention Plan Contents: Controls to Reduce Pollutants**

A.  The SWPPP must include a description of all pollution control measures (i.e., BMPs) that will be implemented as part of the construction activity to control pollutants in storm water discharges. For each major activity identified in the project description the SWPPP must clearly describe appropriate control measures, the general sequence during the construction process in which the measures will be implemented, and which operator is responsible for the control measure's implementation.

B.  The SWPPP must include a description of interim and permanent stabilization practices for the site, including a schedule of when the practices will be implemented. Site plans should ensure that existing vegetation is preserved where possible and that disturbed portions of the site are stabilized. Use of impervious surfaces for stabilization should be avoided.

C.  The following records must be maintained as part of the SWPPP:

   1.  Dates when major grading activities occur;

   2.  Dates when construction activities temporarily or permanently cease on a portion of the site; and

   3.  Dates when stabilization measures are initiated.

D.  The SWPPP must include a description of structural practices to divert flows from exposed soils, retain/detain flows or otherwise limit runoff and the discharge of pollutants from exposed areas of the site. Placement of structural practices in floodplains must be avoided to the degree practicable.

E.  The SWPPP must include a description of all post-construction storm water management measures that will be installed during the construction process to control pollutants in storm water discharges after construction operations have been completed. Structural measures should be placed on upland soils to the degree practicable. Such measures must be designed and installed in compliance with applicable federal, local, state or tribal requirements.

F.  The SWPPP must describe measures to prevent the discharge of solid materials, including building materials, to waters of the United States, except as authorized by a permit issued under section 404 of the CWA.

G.  The SWPPP must describe measures to minimize, to the extent practicable, off-site vehicle tracking of sediments onto paved surfaces and the generation of dust.

H.  The SWPPP must include a description of construction and waste materials expected to be stored on-site with updates as appropriate. The SWPPP must also include a description of controls, including storage practices, to minimize exposure of the materials to storm water, and spill prevention and response practices.

I.  The SWPPP must include a description of pollutant sources from areas other than construction (including storm water discharges from dedicated asphalt plants and dedicated concrete plants), and a description of controls and measures that will be implemented at those sites to minimize pollutant discharges.

**3.5    Non-Storm Water Discharge Management**

The SWPPP must identify all allowable sources of non-storm water discharges listed in Subpart 1.3.B of this permit, except for flows from fire fighting activities, that are combined with storm water discharges associated with construction activity at the site. Non-storm water discharges should be eliminated or reduced to the extent feasible. The SWPPP must identify and ensure the implementation of appropriate pollution prevention measures for the non-storm water component(s) of the discharge.

**3.6    Maintenance of Controls**

A.  All erosion and sediment control measures and other protective measures identified in the SWPPP must be maintained in effective operating condition. If site inspections required by Subpart 3.10 identify BMPs that are not operating effectively, maintenance must be performed as soon as possible and before the next storm event whenever practicable to maintain the continued effectiveness of storm water controls.

B.  If existing BMPs need to be modified or if additional BMPs are necessary for any reason, implementation must be completed before the next storm event whenever practicable. If implementation before the next storm event is impracticable, the situation must be documented in the SWPPP and alternative BMPs must be implemented as soon as possible.

C.  Sediment from sediment traps or sedimentation ponds must be removed when design capacity has been reduced by 50 percent.

**3.7    Documentation of Permit Eligibility Related to Endangered Species**

The SWPPP must include documentation supporting a determination of permit eligibility with regard to Endangered Species, including:

A.  Information on whether federally-listed endangered or threatened species, or federally-designated critical habitat may be in the project area;

B.  Whether such species or critical habitat may be adversely affected by storm water discharges or storm water discharge-related activities from the project;

C.  Results of the Appendix C listed species and critical habitat screening determinations;

D.  Confirmation of delivery of NOI to EPA or to EPA's electronic NOI system. This may include an overnight, express or registered mail receipt acknowledgment; or electronic acknowledgment from EPA's electronic NOI system.

E.  Any correspondence for any stage of project planning between the U.S. Fish and Wildlife Service (FWS), EPA, the U.S. National Marine Fisheries Service (NMFS), or others and you regarding listed species and critical habitat, including any notification that delays your authorization to discharge under this permit;

F.  A description of measures necessary to protect federally-listed endangered or threatened species, or federally-designated critical habitat. The permittee must describe and implement such measures to maintain eligibility for coverage under this permit.

**3.8    Copy of Permit Requirements**

Copies of this permit and of the signed and certified NOI form that was submitted to EPA must be included in the SWPPP. Also, upon receipt, a copy of the letter from the EPA Storm Water Notice Processing Center notifying you of their receipt of your administratively complete NOI must also be included as a component of the SWPPP.

**3.9    Applicable State, Tribal, or Local Programs**

The SWPPP must be consistent with all applicable federal, state, tribal, or local requirements for soil and erosion control and storm water management, including updates to the SWPPP as necessary to reflect any revisions to applicable federal, state, tribal, or local requirements for soil and erosion control.

**3.10    Inspections**

A.  Inspections must be conducted in accordance with one of the two schedules listed below. You must specify in your SWPPP which schedule you will be following.

1.  At least once every 7 calendar days, OR

2.  At least once every 14 calendar days and within 24 hours of the end of a storm event of 0.5 inches or greater.

B   Inspection frequency may be reduced to at least once every month if:

1.  The entire site is temporarily stabilized,

2.  Runoff is unlikely due to winter conditions (e.g., site is covered with snow, ice, or the ground is frozen), or

3.  Construction is occurring during seasonal arid periods in arid areas and semi-arid areas.

C.  A waiver of the inspection requirements is available until one month before thawing conditions are expected to result in a discharge if all of the following requirements are met:

1.  The project is located in an area where frozen conditions are anticipated to continue for extended periods of time (i.e., more than one month);

2.  Land disturbance activities have been suspended; and

3.  The beginning and ending dates of the waiver period are documented in the SWPPP.

D.  Inspections must be conducted by qualified personnel (provided by the operator or cooperatively by multiple operators). "Qualified personnel" means a person knowledgeable in the principles and practice of erosion and sediment controls who possesses the skills to assess conditions at the construction site that could impact

storm water quality and to assess the effectiveness of any sediment and erosion control measures selected to control the quality of storm water discharges from the construction activity.

E. Inspections must include all areas of the site disturbed by construction activity and areas used for storage of materials that are exposed to precipitation. Inspectors must look for evidence of, or the potential for, pollutants entering the storm water conveyance system. Sedimentation and erosion control measures identified in the SWPPP must be observed to ensure proper operation. Discharge locations must be inspected to ascertain whether erosion control measures are effective in preventing significant impacts to waters of the United States, where accessible. Where discharge locations are inaccessible, nearby downstream locations must be inspected to the extent that such inspections are practicable. Locations where vehicles enter or exit the site must be inspected for evidence of off-site sediment tracking.

F. Utility line installation, pipeline construction, and other examples of long, narrow, linear construction activities may limit the access of inspection personnel to the areas described in Subpart 3.10.E above. Inspection of these areas could require that vehicles compromise temporarily or even permanently stabilized areas, cause additional disturbance of soils, and increase the potential for erosion. In these circumstances, controls must be inspected on the same frequencies as other construction projects, but representative inspections may be performed. For representative inspections, personnel must inspect controls along the construction site for 0.25 mile above and below each access point where a roadway, undisturbed right-of-way, or other similar feature intersects the construction site and allows access to the areas described above. The conditions of the controls along each inspected 0.25 mile segment may be considered as representative of the condition of controls along that reach extending from the end of the 0.25 mile segment to either the end of the next 0.25 mile inspected segment, or to the end of the project, whichever occurs first.

G. For each inspection required above, you must complete an inspection report. At a minimum, the inspection report must include:

1. The inspection date;

2. Names, titles, and qualifications of personnel making the inspection;

3. Weather information for the period since the last inspection (or since commencement of construction activity if the first inspection) including a best estimate of the beginning of each storm event, duration of each storm event, approximate amount of rainfall for each storm event (in inches), and whether any discharges occurred;

4. Weather information and a description of any discharges occurring at the time of the inspection;

5. Location(s) of discharges of sediment or other pollutants from the site;

6. Location(s) of BMPs that need to be maintained;

7. Location(s) of BMPs that failed to operate as designed or proved inadequate for a particular location;

8. Location(s) where additional BMPs are needed that did not exist at the time of inspection; and

9. Corrective action required including any changes to the SWPPP necessary and implementation dates.

A record of each inspection and of any actions taken in accordance with this Part must be retained as part of the SWPPP for at least three years from the date that permit coverage expires or is terminated. The inspection reports must identify any incidents of non-compliance with the permit conditions. Where a report does not identify any incidents of non-compliance, the report must contain a certification that the construction project or site is in compliance with the SWPPP and this permit. The report must be signed in accordance with Appendix G, Section 11 of this permit.

## 3.11    Maintaining an Updated Plan

A. The SWPPP, including the site map, must be amended whenever there is a change in design, construction, operation, or maintenance at the construction site that has or could have a significant effect on the discharge of pollutants to the waters of the United States that has not been previously addressed in the SWPPP.

B. The SWPPP must be amended if during inspections or investigations by site staff, or by local, state, tribal or federal officials, it is determined that the SWPPP is ineffective in eliminating or significantly minimizing pollutants in storm water discharges from the construction site.

C. Based on the results of an inspection, the SWPPP must be modified as necessary to include additional or modified BMPs designed to correct problems identified. Revisions to the SWPPP must be completed within

seven (7) calendar days following the inspection. Implementation of these additional or modified BMPs must be accomplished as described in Subpart 3.6.B.

### 3.12    Signature, Plan Review and Making Plans Available

A.   A copy of the SWPPP (including a copy of the permit), NOI, and acknowledgement letter from EPA must be retained at the construction site (or other location easily accessible during normal business hours to EPA, a state, tribal or local agency approving sediment and erosion plans, grading plans, or storm water management plans; local government officials; the operator of a municipal separate storm sewer receiving discharges from the site; and representatives of the U.S. Fish and Wildlife Service or the National Marine Fisheries Service) from the date of commencement of construction activities to the date of final stabilization. If you have day-to-day operational control over SWPPP implementation, you must have a copy of the SWPPP available at a central location on-site for the use of all those identified as having responsibilities under the SWPPP whenever they are on the construction site. If an on-site location is unavailable to store the SWPPP when no personnel are present, notice of the plan's location must be posted near the main entrance at the construction site.

B.   A sign or other notice must be posted conspicuously near the main entrance of the construction site. If displaying near the main entrance is infeasible, the notice can be posted in a local public building such as the town hall or public library. The sign or other notice must contain the following information:

   1.   A copy of the completed Notice of Intent as submitted to the EPA Storm Water Notice Processing Center; and

   2.   If the location of the SWPPP or the name and telephone number of the contact person for scheduling SWPPP viewing times has changed (i.e., is different than that submitted to EPA in the NOI), the current location of the SWPPP and name and telephone number of a contact person for scheduling viewing times.

   For linear projects, the sign or other notice must be posted at a publicly accessible location near the active part of the construction project (e.g., where a pipeline project crosses a public road).

C.   SWPPPs must be made available upon request by EPA; a state, tribal or local agency approving sediment and erosion plans, grading plans, or storm water management plans; local government officials; the operator of a municipal separate storm sewer receiving discharges from the site; and representatives of the U.S. Fish and Wildlife Service or the National Marine Fisheries Service to the requestor. The copy of the SWPPP that is required to be kept on-site or locally available must be made available, in its entirety, to the EPA staff for review and copying at the time of an on-site inspection.

D.   All SWPPPs must be signed and certified in accordance with Appendix G, Section 11.

### 3.13    Management Practices

A.   All control measures must be properly selected, installed, and maintained in accordance with any relevant manufacturer specifications and good engineering practices. If periodic inspections or other information indicates a control has been used inappropriately, or incorrectly, the operator must replace or modify the control for site situations as soon as practicable.

B.   If sediment escapes the construction site, off-site accumulations of sediment must be removed at a frequency sufficient to minimize off-site impacts.

C.   Litter, construction debris, and construction chemicals that could be exposed to storm water must be prevented from becoming a pollutant source in storm water discharges.

D.   Except as provided below, stabilization measures must be initiated as soon as practicable in portions of the site where construction activities have temporarily or permanently ceased, but in no case more than 14 days after the construction activity in that portion of the site has temporarily or permanently ceased.

   1.   Where stabilization by the 14th day is precluded by snow cover or frozen ground conditions, stabilization measures must be initiated as soon as practicable.

   2.   Where construction activity on a portion of the site is temporarily ceased, and earth disturbing activities will be resumed within 14 days, temporary stabilization measures do not have to be initiated on that portion of the site.

**4.5    Attainment of Water Quality Standards After Authorization**

A.  You must select, install, implement and maintain BMPs at your construction site that minimize pollutants in the discharge as necessary to meet applicable water quality standards.  In general, except in situations explained in Subpart 4.5.B below, your SWPPP developed, implemented, and updated consistent with Part 3.0 is considered as stringent as necessary to ensure that your discharges do not cause or contribute to an excursion above any applicable water quality standard.

B.  At any time after authorization, EPA may determine that your storm water discharges may cause, have reasonable potential to cause, or contribute to an excursion above any applicable water quality standard. If such a determination is made, EPA will require you to:

  i.   Develop a supplemental BMP action plan describing SWPPP modifications in accordance with Subpart 3.11 to address adequately the identified water quality concerns;

  ii.  Submit valid and verifiable data and information that are representative of ambient conditions and indicate that the receiving water is attaining water quality standards; or

  iii. Cease discharges of pollutants from construction activity and submit an individual permit application according to Subpart 4.2.

All written responses required under this part must include a signed certification consistent with Appendix G, Section 11.

**PART 5: TERMINATION OF COVERAGE**

**5.1    Requirements**

You may only submit a Notice of Termination (NOT) after one or more of the following conditions have been met:

A.  Final stabilization has been achieved on all portions of the site for which you are responsible;

B.  Another operator has assumed control according to Appendix G, Section 11.C over all areas of the site that have not been finally stabilized;

C.  Coverage under an individual or alternative general NPDES permit has been obtained; or

D.  For residential construction only, temporary stabilization has been completed and the residence has been transferred to the homeowner.

The NOT must be submitted within 30 days of one of the above conditions being met. Authorization to discharge terminates at midnight of the day the NOT is signed.

**5.2    Submitting a Notice of Termination**

It is your responsibility to submit a complete and accurate Notice of Termination (NOT), using the form provided in Appendix F (or a photocopy thereof) available at www.epa.gov/npdes/stormwater/cgp. If EPA notifies dischargers (either directly, by public notice, or by making information available on the Internet) of other NOT form options (e.g., electronic submission), you may take advantage of those options to satisfy the requirements of Part 5.

A.    The Notice of Termination must include the following information:

  1.  The NPDES permit tracking number for the storm water discharge;

  2.  The basis for submission of the NOT, including: final stabilization has been achieved on all portions of the site for which the permittee is responsible; another operator/permittee has assumed control over all areas of the site that have not been finally stabilized; coverage under an alternative NPDES permit has been obtained; or, for residential construction only, temporary stabilization has been completed and the residence has been transferred to the homeowner;

  3.  You, the operator's name, address, telephone number and your organization's Employer Identification Number (EIN) as established by the U.S. Internal Revenue Service;

  4.  The name of the project and address (or a description of location if no street address is available) of the construction site for which the notification is submitted; and

  5.  A certification statement, signed and dated by an authorized representative as defined in Appendix G, Section 11 and the name and title of that authorized representative.

# Exhibit C



# TROOSTWOOD NEIGHBORHOOD ASSOCIATION
### A 49/63 NEIGHBORHOOD

08cv115SLR

April 22, 2008

Peter T. Dalleo
Clerk of the Court
U.S. District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, DE. 19801

SUBJECT:    Home Depot Consent Decree and Penalty – Violations to the Clean Water
            Act – Public Comment and Proposal for Use of Award for the Troostwood
            Neighborhood, Kansas City, Missouri Activities

TO: Clerk of the Court:

We request that the following submission be forwarded to the presiding judge for
consideration for allocation of a pending penalty payment by Home Depot.

The Troostwood Neighborhood is a low and moderate income, mixed race neighborhood
in central Kansas City, Missouri. We have worked hard over the years to preserve this
historic American bungalow neighborhood, but in these times there is much more to do.

In consideration of the $1.3 million penalty against Home Depot for violations of
provisions of the Clean Water Act we request that $300,000 be awarded to the
Troostwood Neighborhood. These funds will be used for stormwater run-off reduction,
energy conservation, and old tree removal/new tree planting programs. The funds will be
administered by the local, nonprofit housing agency and made available to all
homeowners in the neighborhood.

Our request is to make these funds work in the area of violation for the people who need
assistance. If approved, we will work directly with the local Home Depot outlet on a debt
card basis and 10% for administrative costs, and provide a full, auditable report back to
the Court for its review.

Thank you in advance for considering this request.

Sincerely,

Stuart Bullington, President
5015 Troostwood Road
Kansas City, Missouri 64110

FILED
CLERK, U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2008 APR 25 PM 3: 45

Stuart Bullington
5015 Troostwood Road
KCMO 64110

KANSAS CITY 641-661

22 APR 2008 PM 2 L



Peter T. Dalleo
Clerk of the Court
U.S. District Court for the Dist. of Columbia
J. Caleb Boggs Federal Building
844 N.  King Street
Wilmington, DE. 19801



19801$3519

# Exhibit D

**Westlaw.**

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1832825 (E.D.Pa.), 55 ERC 1283
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1832825)**

**C**
U.S. v. Atofina Chemicals, Inc.
E.D.Pa.,2002.

United States District Court, E.D. Pennsylvania.
UNITED STATES of America,
v.
ATOFINA CHEMICALS, INC.
**No. CIV.A. 01-7087.**

Aug. 5, 2002.

The United States sued a chemical company on be-
half of the Environmental Protection Agency
(EPA), alleging that the company failed to comply
with multiple environmental statutes and regula-
tions at six of its chemical processing facilities. On
the United States' motion for entry of a consent de-
cree, the District Court, Shapiro, Senior District
Judge, held that the consent decree fairly, ad-
equately, and reasonably resolved the action, and as
a whole, it served the public interest.

Motion granted.

West Headnotes

**Federal Civil Procedure 170A ⬮2397.2**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(A) In General
            170Ak2397 On Consent
                170Ak2397.2 k. Form and Requisites;
Validity. Most Cited Cases
Consent decree in United States' action against a
chemical company, alleging that the company
failed to comply with multiple environmental stat-
utes and regulations at six of its chemical pro-
cessing facilities, fairly, adequately, and reasonably
resolved the action, and as a whole, served the pub-
lic interest, and thus, the decree would be entered
by the court, even though the government did not
comply with its own recommended policy of com-
munity notification and participation in the design

of a Supplemental Environmental Project (SEP);
the SEP called for by the decree had an adequate
nexus with violations at one factory, and did not
replicate existing programs, or clearly supplant fu-
ture programs.

*MEMORANDUM AND ORDER*

NORMA L. SHAPIRO, S.J.
**\*1** The United States, filing a complaint against
Atofina Chemicals, Inc. ("Atofina") on behalf of
the Environmental Protection Agency ("EPA"), al-
leged Atofina failed to comply with multiple envir-
onmental statutes and regulations at six of its chem-
ical processing facilities. The parties having negoti-
ated a settlement, the United States published a pro-
posed consent decree for public comment for thirty
days as required by 28 C.F.R. § 50.7. A non-party,
the LeMoyne Community Advisory Panel
("LCAP"), a community group allegedly affected
by Atofina's wrongdoing, made the only objections.
The United States now moves for entry of the con-
sent decree.

The United States' Motion for Entry of a Consent
Decree requires the court to evaluate if the pro-
posed settlement fairly, adequately, and reasonably
serves the public interest. The court has concerns
about that portion of the consent decree objected to
by LCAP, the "Supplemental Environmental
Project" provision, but the Motion of the United
States for the Entry of the Consent Decree will be
granted.

I. Factual and Procedural Background

A. *Allegations Against Atofina*

Atofina Chemicals, a Pennsylvania corporation, op-
erates chemical product manufacturing facilities
("facilities") at: Axis, Alabama; Calvert City and
Carrollton, Kentucky; Beaumont and Houston,
Texas; and Piffard, New York. The United States

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1832825 (E.D.Pa.), 55 ERC 1283
(Cite as: Not Reported in F.Supp.2d, 2002 WL 1832825)

brought fifteen claims against Atofina for alleged polluting activities at these facilities. The allegations of the complaint are summarized below.

### 1. Axis, Alabama

The Axis, Alabama facility violated provisions of the Clean Air Act, 42 U.S.C. §§ 7409-7411, by constructing, and modifying, the 200/300 process units, the thioglycolic acid process unit, Dryer A, Dryer B, and the Metablen I and Metablen II impact modifer units. Atofina failed to undergo the review and permit application process necessary when a company creates a major new source of pollution or makes a "major modification" to an old source.

The facility also violated the Clean Water Act, 33 U.S.C. § 1311, by discharging pollutants into the following waters of the United States: Mobile River; Cold Creek; and a tributary of Cold Creek. These discharges exceeded the limits provided by NPDES Permit No. AL0042447.

### 2. Calvert City, Kentucky

The Calvert City, Kentucky facility violated provisions of the Clean Air Act by modifying its Kynar Monomer and Polymer plants and constructing a F134a plant. The company failed to receive the pre-approval necessary when a company creates a major new source of pollution or makes a "major modification" to an old source. The facility also failed to apply for a permit to "de-bottleneck" its K098 plant to increase production without performing the required analysis of the best available control technology at this location. See 40 C.F.R. § 52.21(j)(3).

This same facility violated the Clean Water Act by discharging pollutants into waters of the United States in levels exceeding those permitted by KPDES Permit No. KY003603, by modifying how it tested those discharges, and by failing to notify the State Department of Environmental Protection or the EPA of these discharges and modifications.

The Calvert City facility also violated the Emergency Planning and Community Right to Know Act ("EPCRA"), 42 U.S.C. § 11045(c)(1), by failing to report, or underreporting, on a chemical release form, releases of chlorine, carbon tetrachloride, and CFC-11 into the environment.

### 3. Carrollton, Kentucky

*2 The Carrollton, Kentucky facility violated the Clean Water Act by discharging pollutants into the waters of the United States in levels exceeding those permitted by KPDES Permit No. KY0001431.

The facility also violated the Resource Conservation and Recovery Act ("RCRA"), as amended by the Hazardous and Solid Waste Amendments Act of 1984, 42 U.S.C. §§ 6922-25, by failing to install necessary equipment to control emissions from a hazardous waste stored in Treatment Tank TK-52-20 ("the Hydropulper").

Finally, the facility violated EPCRA by failing to report correctly the amounts of methyl-ethyl ketone, xylene, and chloromethane released into the environment from 1994 to 1997.

### 4. Beaumont, Texas

The Beaumont, Texas facility's Hydrogen Sulfide ("H2S") plant had a permit, obtained in 1989, to vent pollution through a flare when an incinerator built for that purpose was not in service. The permit limited the flare's use to specified periods. In 1995, the flare's use exceeded the time limitation, in violation of Section 113(b) of the Clean Air Act.

The facility's second violation occurred in 1995, when it released visible emissions for a time exceeding that permitted by the applicable federal regulations. See 40 C.F.R. § 60.18(c)(1), (f).

The facility's third violation also occurred in 1995 when it had "39 upsets, 21 shutdowns, and 13 other events," in violation of the Clean Air Act. See 40

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 1832825 (E.D.Pa.), 55 ERC 1283
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1832825)**

C.F.R. § 60.11(d).

*5. Houston, Texas*

The Houston, Texas facility discharged pollutants into the Houston Ship Channel (United States waters), in levels exceeding those permitted by NP-DES Permit No. TX0007064, in violation of the Clean Water Act. The facility also discharged more than 3.9 million gallons of untreated storm water and wastewater into United States waters; it lacked adequate retention capacity in times of heavy rain.

*6. Piffard, New York*

The Piffard, New York facility violated EPCRA by failing to report correctly the amounts of methyl-ethyl ketone released into the environment from 1994 to 1996, and t-butyle alcohol released from 1994 to 1995.

The government demanded that Atofina comply with the applicable regulations immediately, and that the court assess civil penalties.

*B. The Consent Decree*

Atofina, without admitting liability for any of the charges of the Complaint, assents to the following injunctive, monetary, and supplemental relief.

*1. Injunctive Relief*

a. Clean Air Act Violations

Atofina will: (1) operate its existing thermal oxidizer to destroy 95% of volatile organic compounds from the Calvert City Monomer Plant; (2) use an existing incinerator to destroy 95% of ozone depleting substance emissions from its Calvert City K-98 Plant; (3) install a thermal oxidizer to destroy 95% of organic compound emissions from the Carrollton facility; and (4) install a "Nitrogen Demand System" at the Carrollton facility.

b. Clean Water Act Violations

**\*3** Atofina will: (1) install and operate continuous pH monitoring equipment at its Calvert City and Carrollton facilities, and report results to the permitting authority; (2) apply for and obtain modification of permits to reflect the new system of continuous monitoring; and (3) construct stormwater facilities and develop a management plan for the Houston facility.

c. RCRA violations

Atofina will install a fixed cover and slide gate system on the Hydropulper at the Carrollton facility.

*2. Civil Penalties*

Atofina will pay a fine in the amount of $1,900,000 to the United States Treasury.

*3. Supplemental Environmental Project*

The United States, as part of the consent decree, allowed Atofina to pay less in civil penalties and perform a Supplemental Environmental Project ("SEP") instead.

The proposed SEP would beautify and remediate a mile-long section of the Montlimar Canal, in Mobile, Alabama, at a total cost of $300,000. The Montlimar Canal is a tributary of the Dog River that in turn flows into the Mobile Bay. Pollutants from Atofina's Axis, Alabama facility also flow into Mobile Bay, through different waterways.

The SEP will have the following characteristics:

a. A "greenway" will be built along the Canal. This greenway will reduce erosion into the Canal;

b. A hiking, biking, and exercise trail will transverse the western bank of the Canal;

c. The trail will include educational stations focus-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 1832825 (E.D.Pa.), 55 ERC 1283
(Cite as: Not Reported in F.Supp.2d, 2002 WL 1832825)

ing on the relationship between water quality in the City of Mobile and water quality in the Mobile Bay;

c. The remediation project, when combined with a series of "Greenway Parks" along the Canal, will double the acreage of existing parks in the City of Mobile.

### 4. *Continuing Jurisdiction*

The consent decree provides that the court will retain jurisdiction over this action to enforce the terms of the settlement and to adjudicate disputes between the parties about its provisions. Disputes will be brought to court only after the parties engage in private negotiation. The court's continuing jurisdiction will terminate: (1) on the United States' motion; or (2) on Atofina's motion, if the company certifies that it has complied with the decree and the United States does not object within sixty (60) days.

### C. *Objections to the Consent Decree*

LCAP provided the only comment during the public notice period. LCAP's objections, fairly read, state: (1) no part of the SEP will be performed in the LeMoyne Community where Atofina's Axis plan is located; (2) no member of LCAP was advised of the proposed SEP while it was being developed; (3) alternative projects in LeMoyne County would directly help those harmed by Atofina's wrongdoing.

LCAP renewed its objections with the court: an evidentiary hearing was held to consider LCAP's claims that it had no notice of the consent decree and the local community would derive no benefit from the SEP. Later its representative asserted that the SEP would replace projects already funded by the United States or Alabama's Department of Environmental Management.

### D. *Supplemental Evidence about the SEP*

*4 The government presented no evidence at the evidentiary hearing, but requested leave to file supplemental evidence about the genesis and impact of the SEP. The government, Atofina, and LCAP have all filed materials about the genesis and value of the SEP.

### 1. *The Government's Supplemental Submissions*

The United States submitted the affidavit of Thomas C. Welborn, Chief of the Wetlands, Coastal, and Watersheds Branch of the Water Management Division of the EPA, Region 4. EPA Region 4 is responsible for administering Federal environmental programs in Alabama. Welborn avers that he is knowledgeable about federal funds directed toward remediation efforts in the Mobile Bay Estuary program, and no federal or state "monies have been used, or are planned to be used, for restoration of the Montlimar Canal or associated projects."

### 2. *Atofina's Supplemental Submissions*

Atofina submitted the affidavit of Treena Piznar, one of its employees. Piznar was a Senior Environmental Engineer at Atofina's Axis plant when the SEP was being developed. She avers that she obtained a list of possible SEP projects from the Alabama Department of Environmental Management.

### 3. *LCAP's Supplemental Submissions*

LCAP submitted evidence to establish that the Montlimar Canal will soon receive, or has received, Federal and/or State environmental funding. For example, LCAP has submitted a National Estuary Program map listing the Mobile Bay as an area receiving Federal funds for study and environmental repair.

### II. Discussion

### A. *Standard of Review*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1832825 (E.D.Pa.), 55 ERC 1283
(Cite as: Not Reported in F.Supp.2d, 2002 WL 1832825)

A consent decree must fairly, adequately, and reasonably resolve the pending controversy, while remaining consistent with the public interest. *See Walsh v. Great Atlantic & Pacific Tea Co., Inc.* 726 F.2d 956, 965 (3d Cir.1983). District courts have discretion either to accept, or to reject, a proposed consent decree: the court may not modify the settlement into one which it "considers as ideal." *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir.1990); *see also United States v. Southeastern Pennsylvania Transp. Auth.*["SEPTA"], 235 F.3d 817, 822 (3d Cir.2000) (describing limited discretion of district court); *Officers for Justice v. Civil Service Com.*, 688 F.2d 615, 630 (9th Cir.1982) (lack of power to modify).

In the context of environmental litigation brought by the United States, the court owes "deference ... to [the] EPA's expertise and to the law's policy of encouraging settlement."*SEPTA*, 257 F.3d at 822. Because the EPA is invested with special expertise about environmental torts, and uses that expertise in crafting judicious compromises, settlements approved by the EPA are especially favored. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir.1990).

In determining if the settlement is fair and adequate, an important consideration is its application to the purposes of the environmental statutes forming the basis of the complaint.[FN1]

> FN1. In passing the Clean Water Act, Congress undertook the "restoration and maintenance of chemical, physical and biological integrity of Nation's waters. 33 U.S.C. § 1251. To achieve these objectives, Congress hoped to: (1) immediately end discharge of pollutants into waters of the United States; and (2) provide federal funds to construct waste treatment facilities. *Id.* at 1251(a). The Clean Air Act's goal is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare ..."42 U.S.C. § 7401(b)(1). RCRA's primary

policy goal is to "reduce[ ] or eliminate[ the creation of hazardous waste] as expeditiously as possible. Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment."42 U.S.C. 6902(b). ECPRA, as its title suggests, aids emergency preparedness by enabling authorities to know the nature and location of hazardous chemicals in their jurisdictions. *See U.S. v. BP Exploration & Oil Co.*, 167 F.Supp.2d 1045, 1054 (N.D.Ind.2001).

**\*5** The rationale for deference to the EPA's judgment about the costs of Atofina's alleged wrongdoing, and the societal benefits accruing from the consent decree, is clear. The EPA, unlike the court, is well-placed to evaluate fairly the social harms caused by events like the H2S flare. The EPA, unlike the court, has considered the complex benefits flowing to society from requiring 95% destruction of polluting gases at Atofina's facilities, building a stormwater drainage facility in Texas, and constructing a fixed cover and slide gate system on the Hydropulper in Kentucky. The EPA is best placed to balance environmental harms and benefits against each other: the court's discretion to reweigh the balance is necessarily limited.

### B. *Injunctive and Civil Relief*

Although this consent decree does not provide for injunctive relief from each and every alleged violation of the environmental laws (for example, ECPRA and RCRA violations apparently are remedied only through civil fines), the EPA's judgment that the civil penalties and remedial provisions fairly, adequately, and reasonably resolve this action is unchallenged.[FN2]

> FN2. LCAP raises no objection to the substantive components of the consent decree.

By this settlement, the United States avoids pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1832825 (E.D.Pa.), 55 ERC 1283

(Cite as: Not Reported in F.Supp.2d, 2002 WL 1832825)

longed litigation with its attendant risks. Atofina's willingness to settle the claims against it makes it more likely that it will comply, in good faith, with the terms of the decree. Those terms create new waste management facilities, and new air pollution control mechanisms, and penalize the Atofina almost two million dollars. The court finds that the consent decree's substantive components serve the policies of the allegedly violated environmental statutes and the public interest.

### C. The SEP

The EPA's Supplemental Environmental Projects Policy (the "Policy") provides an Agency guideline for allowing an environmentally beneficial project to mitigate civil penalties due the United States for environmental violations. *See Final EPA Supplemental Environmental Projects Policy,* 63 Fed.Reg. 24796 (1998); *see also* EPA, *Supplemental Environmental Projects* (last modified Jun. 19, 2002) <http://www.epa.gov/Compliance/planning/data/multimedia/seps/sep.html>. The Policy was intended to clarify the EPA's authority to negotiate SEPs in the response to claims by the General Accounting Office, and the Department of Justice, that the EPA's use of SEPs exceeded its delegated authority. *See* Quan B. Nghiem, Comment, *Using Equitable Discretion to Impose Supplemental Environmental Projects Under the Clean Water Act,* 24 B.C.Envtl.Aff.L.Rev. 561, 570-71 (1997); Kathleen Boergers, *The EPA's Supplemental Environmental Projects Policy,* 26 Ecology L.Q. 777, 784 (1999). The United States has not provided the court with clear Congressional authorization for the EPA's agreeing to the SEP in this consent decree.[FN3] But, in the absence of any challenge by LCAP, the court declines to rule on this issue *sua sponte.*

> FN3. The sole exception is the Clean Air Act, which provides that up to $100,000 of any civil penalty may be used in "beneficial mitigation projects." 42 U.S.C. § 7604(g) (1994). The SEP in this consent decree remedies violations of the Clean

Water Act.

The Policy imposes several conditions that a SEP must meet. Of those conditions, three are relevant here. A proposed SEP: (1) must have an "adequate nexus" with the underlying violation, 63 Fed.Reg. 24796, at 24798;[FN4] (2) can not duplicate remedies the defendant is not otherwise obligated to perform, *id.*; and (3) should be informed by local community input, *id.* at 24803.

> FN4. An "adequate nexus" exists if:
>
>> a. The project is designed to reduce the likelihood that similar violations will occur in the future; or
>>
>> b. The project reduces the adverse impact to public health or the environment to which the violation at issue contributes; or
>>
>> c. The project reduces the overall risk to public health or the environment potentially affected by the violation at issue. 63 Fed.Reg. 24796, at 24798.
>>
>> One factor in nexus inquiry is geographic proximity: an adequate nexus is easier to establish if the proposed SEP is within 50 miles of the location of the violations. The SEP may have a sufficient nexus even if it addresses a different pollutant in a different medium.

*6 The Policy states that it is "not intended for use by EPA, defendants, respondents, courts or administrative law judges at a hearing or in trial." *Id.* at 24797. The decision to accept an SEP is "purely within EPA's discretion," *id.,* and the Policy itself may be modified "with the advance approval of Headquarters." *Id.* The Policy "does not create any rights, duties, or obligations, implied or otherwise, in any third parties." *Id.* at 24804. In light of this language, it is unclear if violations of the Policy require, or allow, a court to reject a consent decree.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 7
Not Reported in F.Supp.2d, 2002 WL 1832825 (E.D.Pa.), 55 ERC 1283
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1832825)**

Even if the court had the clear authority to enforce the terms of the EPA policy, it lacks the power to modify the consent decree by striking the SEP and leaving the rest of the agreement intact. Given the choice of rejecting or accepting the agreement as written, the public interest is served by entering the consent decree.

The proposed SEP does have an adequate nexus with the violations at the Axis, Alabama factory. The Policy provides that the geographic nexus requirement is 50 miles: LCAP admits that Mobile is within 50 miles of Axis. Runoff from both the Axis facility and the Canal flows into the Mobile Bay Estuary system, part of the waters of the United States. By improving the drainage of the Canal, the United States asserts the Mobile Bay system will be remediated. This conclusion is entitled to substantial deference.

The proposed SEP does not replicate existing programs, or clearly supplant future programs. The affidavit submitted by the United States is dispositive. Although the court has carefully considered LCAP's submissions, there is no evidence of record that the Mobile Bay study area has given, or plans to give, funding to the Montlimar Canal Greenway project, as LCAP contends.

However, the government did not comply with its own recommended policy of community notification and participation in project design. Rather than conduct a public meeting, the United States delegated to Atofina, the allegedly polluting entity, the task of locating and designing an appropriate project. Atofina, in turn, contacted the Alabama State Department of Environmental Management, which recommended the Montlimar Canal project (among others). This process failed to follow the EPA's procedure for community notification: there is no evidence the EPA held a public meeting with the local community, as the policy recommends. *See* 63 Fed.Reg. 24796, at 24803. Instead, Atofina alone solicited some limited organizational input: this delegation undermined the "primary role" the EPA should play in managing community involve-

ment. *Cf. Draft EPA Guidance for Community Involvement in Supplemental Environmental Projects,* 65 Fed.Reg. at 40639 (2000). The SEP was not designed with the benefit of prior comment by citizen groups of the local community most directly affected by Atofina's polluting activities; that community had the ability to comment only after the SEP had been negotiated and defined.[FN5] By not requiring the alleged polluter to comply with the community notification policy, the EPA *potentially* allowed Atofina to give priority to irrelevant political considerations while ignoring local groups who should have been at least consulted in the SEP's design. The United States reviewed the SEP before agreeing to it, but if it had conditioned approval on compliance with its community notification policy, it might have clarified whether the proposed SEP serves public, rather than private, ends.

> FN5. The proposed SEP is supported by other "community" groups like the Alabama Rivers Alliance, the Mobile Tricentennial Board, and the Hearin-Chandler Family YMCA. There is no evidence that these groups participated in the design of the SEP.

The court understands the frustration of the citizens' group in Axis, Alabama. It may have been adversely affected by Atofina's violation of the environmental laws. But that frustration does not permit rejecting a consent decree that, as a whole, serves the public interest.

III. Conclusion

*7 The consent decree fairly, adequately, and reasonably resolves this action. As a whole, it serves the public interest. The Motion for Entry of a Consent Decree will be granted.

*ORDER ENTERING CONSENT DECREE*

AND NOW, this 5th day of August, 2002, for the reasons given in the foregoing memorandum, it is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                            Page 8
Not Reported in F.Supp.2d, 2002 WL 1832825 (E.D.Pa.), 55 ERC 1283
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1832825)**

ordered that:

1. The United States Motion for Entry of Consent Decree (# 4) is GRANTED.

2. The attached Consent Decree is entered, and shall be filed of record.

3. The court will retain jurisdiction over this action to the extent provided in Sections XII, XIX and XXV of the Consent Decree.

4. The clerk of court shall send a copy of this Memorandum and Order to the following individual:

Don Tolbert

LCAP

13040 N. Forest Dr.

Axis, AL 36505

E.D.Pa.,2002.
U.S. v. Atofina Chemicals, Inc.
Not Reported in F.Supp.2d, 2002 WL 1832825 (E.D.Pa.), 55 ERC 1283

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E

*Inc. v. Village of Hempstead,* 148 AD2d 570; *Church of Scientology of New York v. Tax Commission of the City of New York,* 120 AD2d 376; *Holy Spirit Assn. for the Unification of World Christianity v. Tax Commission of the City of New York,* 62 AD2d 188). Where a municipality seeks to withdraw a previously granted tax exemption, the municipality bears the burden of proving that the real property is subject to taxation (*New York Botanical Garden v. Assessors of the Town of Washington,* 80 AD2d 170, *aff'd* 55 NY2d 328). By extension, where a taxpayer seeks to have a tax exemption withdrawn by the municipality, the taxpayer bears the burden. "In view of public interest against frequent second-guessing of assessment decisions, the burden petitioner must carry is not slight" (*Matter of Dudley, supra* at 552).

The proof required in a special proceeding is similar to a motion for summary judgment in that the parties are obligated to submit their proofs with their pleadings "showing such evidentiary facts as shall entitle (them) to a trial of any issue of fact" [CPLR §7804(e)]. Here, petitioner's allegations as to the use of Gibb House, which are made on information and belief, amount to nothing more than conjecture and are insufficient to rebut the Conservancy's described use of Gibb House which is based on statements by persons having direct and personal knowledge such as the Executive Director (see, *Gagnon v. Board of Education of the Manhasset Union Free School District,* 119 AD2d 674; *Matter of 22 Park Place Cooperative, Inc. v. Board of Assessors of the County of Nassau,* 102 AD2d 893, 893-894).

The use of the premises described in a Memorandum by the Executive Director to the Assessor in support of the exemption provided a rational basis for her to conclude Gibb House was primarily used for purposes integral and necessary to the operation of the Preserve. To the extent petitioner contests the need for a full-time steward, he merely asserts a disagreement of opinion. Such a difference does not establish the Conservancy is incorrect in its belief that a full-time steward is essential to maintaining the Preserve. Indeed, as pointed out by the Conservancy, the practice of providing housing for a resident watch-person is consistent with that followed elsewhere in places such as the Butler Sanctuary, the Westmoreland Sanctuary, Ward Pound Ridge Reservation in Westchester County and the Uplands Farms and Mashomack nature preserves in Long Island. The fact, that Gibb House is not on the Preserve itself, is irrelevant since it is still near enough to the Preserve to infer a nexus between the functions performed by Gibb House and the Preserve (see, *St. Luke's Hospital v. Boyland,* 12 NY2d 135; *Thomas G. Clarkson Memorial College of Technology v. Haggett,* 191 Misc 621, *aff'd* 274 AD 732, *aff'd* 300 NY 595; *In re Syracuse University,* 124 Misc 788, *aff'd* 214 AD 375).

There has also been no proof that the benefit to the Executive Director from the housing provided her and her family constitutes pecuniary profit that would defeat the exemption under RPTL §402-1(1)(b). RPTL §420-a(1)(b) specifically permits "reasonable compensation for services in affecting the organizations purposes." Even imputing a reasonable rental value of the residential portion of Gibb House to the Executive Director, and combining that with her salary of $28,000 in 1990, the Court is unable to conclude that the sum exceeds reasonable compensation for the services rendered.

### III

Finally, the Court finds petitioner's stated interest in contesting the Gibb House markedly disingenous. This matter has been tenaciously fought, no doubt at considerable expense to petitioner. It defies common sense that such intensive litigation would be pursued for an abstract interest. This is especially so where the challenger is not a resident of the Town, who perhaps might have a personal and long-term concern for the Town's tax base, but rather a developer whose interests one would expect to be tied to a definite shorter-term monetary return.

Given the absence of any apparent real pecuniary benefit to petitioner from this litigation, if he were successful, the Court can only conclude that petitioner's motivation is that ascribed to him by the Conservancy—retribution against the Conservancy for opposing his development plans for the area around the Mianus Gorge, and an effort to chill the Conservancy's future exercise of its First Amendment rights. With these goals, it is apparent that petitioner may well succeed, despite dismissal of the Petition, simply by having forced the Conser-

vancy to incur the expense of defending the exemption for the Gibb House parcel. Indeed, this lawsuit would appear to be the type of case warned of by Judge Gabrielli in his dissent in *Dudley* where he stated:

"(A)though individual property owners rarely have a substantial financial stake in the amounts collected from their fellow taxpayers, petty jealousies and rivalries may lead them . . . to bring vexatious lawsuits" (52 NY2d at 556).

Under the circumstances, the Court finds that this proceeding was undertaken primarily, if not solely, to harass or maliciously injure the Conservancy. Such litigation constitutes "frivolous" conduct as the term is defined in 22 NYCRR §130.1-1(c)(ii) (see, e.g., *Matter of Minister, Elders and Deacons of Refm. Prot. Dutch Church of City of New York v. 198 Broadway,* 76 NY2d 441).

Abuse of the right to petition for judicial review should not be countenanced. As recently noted by Attorney General Robert Abrams at an environmental colloquium, the participation of citizen watch groups in environmental planning has been "essential to ensure that governmental efforts at environmental protection are fully effective."[4] A number of citizen suits "have established essential principles of early review and strict adherence to the procedures laid out in SEQRA which have served as crucial tools in making projects safe for the environment"[5] Citizen activism, if it is to continue, must be fostered and protected from lawsuits designed solely or primarily to intimidate and extract a price for participation.

22 NYCRR §130.1-1(a) permits the Court, in its discretion, to award costs for frivolous conduct in the form of reimbursement for actual expenses reasonably incurred and reasonable attorney's fees. An award appears appropriate in this case both as compensation to the Conservancy and as a deterrent against future abuse of the judicial system (cf *Hoeflich v. Chemical Bank,* 149 AD2d 341, 342).

The Court reserves decision on the specific award to the Conservancy, however, pending a further opportunity to the parties to be heard [see, 22 NYCRR §130.1-1(d); see, e.g. *Mechta v. Mack,* 154 AD2d 440, 441; *Bruckner v. Jaitor Apartments, Co.,* 147 Misc2d 796]. Although costs and expenses were requested in the Conservancy's Answer, the Conservancy has not specified the nature of the expenses for which it seeks reimbursement or documented what its costs and expenses actually are. The Conservancy may submit proof of its costs and expenses in support of an award under 22 NYCRR §130.1-1(a) by April 8, 1991. Petitioner may respond by April 22, 1991.

The Assessor's request for costs and expenses is granted to the extent that she is awarded costs and disbursements pursuant to CPLR §§8201 and 8301.

Petition is dismissed. Judgment may be settled, on notice, after resolution of the award to the Conservancy.

## United States v. Roll Coater, Inc.

No. IP 89-828 C (S.D. Ind. Mar. 22, 1991)

The court holds that a company in the business of coil coating must pay a $2,093,750 civil penalty for violations of pretreatment standards under the Federal Water Pollution Control Act (FWPCA). The court first holds that FWPCA §309(a)(3) does not prevent the government from bringing a civil action for past violations after it ordered the defendant to comply with pretreatment standards in the future. A contrary reading is plainly inconsistent with the strong enforcement policy of the Act. The court further holds that the government's delay in notifying the defendant of violations and bringing suit for those violations does not bar recovery under the doctrine of equitable estoppel or laches. The court calculates the maximum statutory penalty for the defendant's violations from the first date that the defendant could have reasonably known that its satisfaction of state requirements did not satisfy the Environmental Protection Agency. Reducing this amount to take account of mitigating factors, the court holds that the defendant's violations are not serious, because no damage to the environment was proven, and that the defendant demonstrated good faith by making several interim improvements to the existing facility and delaying construction in

4. Address by Attorney General Robert Abrams, Center for Environmental Legal Studies, Pace University School of Law, White Plains, New York, October 14, 1989 annexed as Appendix "A" to Conservancy's Memorandum of Law Page 1 of Text.
5. *Id* at p. 6 of Text.

order to develop new technology. The court holds that the resulting penalty will not have a detrimental economic impact on the defendant's business, but is larger than the estimated economic benefit to the defendant of noncompliance. Finally, the court holds that it lacks equitable jurisdiction to order the penalty to be paid to entities other than the U.S. Treasury, because the government's claim for injunctive relief has been dismissed.

Counsel for Plaintiff
Michael J. McNulty
Environmental Enforcement Section
U.S. Department of Justice, P.O. Box 7611, Ben Franklin Station, Washington DC 20044
(202) 514-2000

Counsel for Defendant
Renee R. McDermott, John M. Kyle III, Anthony C. Sullivan
Barnes & Thornburg
1313 Merchants Bank Bldg., 11 S. Meridian St., Indianapolis
IN 46204
(317) 638-1313

McKinney, J.:

### Order Following Bench Trial

This action was tried to the Court from December 17 through 19, 1990. The Court, having reviewed all admitted evidence, makes the following findings of fact and conclusions of law.

### I. Findings of Fact

This dispute concerns the United States Environmental Protection Agency ("USEPA"), and Roll Coater, Inc. ("Roll Coater"). Roll Coater paints rolls of raw metal in preparation for further manufacturing by other companies. This process is commonly known as coil coating. The gist of the complaint is that Roll Coater emitted unsatisfactorily treated effluent into the City of Greenfield's wastewater system. The United States seeks to use its influence to increase its affluence due to this effluent.

This action is brought pursuant to the Clean Water Act, 33 U.S.C. §1311, et seq. (the "Act"), and the National Categorical Pretreatment Standards promulgated thereunder ("pretreatment standards"), 40 C.F.R. §465. The appropriate penalty for violation of the Act is determined by §309(d), 33 U.S.C. §1319(d).

Section 307(d) of the Act, 33 U.S.C. §1317(d), states that no person shall violate any pretreatment standard after its effective date. The pretreatment standards for coil coating were promulgated on December 1, 1982, and required compliance by December 1, 1985. The standards are subdivided into four categories: steel basis materials, aluminum basis materials, galvanized basis materials, and cans. 40 C.F.R. §465, Subparts A, B, C, and D. Each of these subcategories contains different discharge standards for pollutants. Because Roll Coater coats steel, aluminum, and galvanized materials, it is subject to subparts A, B, and C. It is undisputed that Roll Coater did not achieve compliance with the pretreatment standards from June 1986 until July 1989, when it completed a new wastewater treatment facility.[1]

Other factual findings are presented in subsequent sections of this Order, and will not be repeated here.

### II. Conclusions of Law

#### A. Liability

Because the Act is a strict liability statute, a discussion of liability, after the Court has found a violation, would seem unnecessary. However, Roll Coater has raised issues of liability which must be addressed.

#### 1. Compliance "or" Civil Action

First Roll Coater argues that because it was ordered to comply with the regulations, USEPA cannot bring a civil action for past violations. The Act provides that the administrator "shall issue an

order requiring such person to comply or he shall bring a civil action." 33 U.S.C. §1319(a)(3) (emphasis added). Roll Coater argues that the plain meaning of the disjunctive "or" controls, and that if USEPA requires compliance, a civil action cannot be filed. Although the Seventh Circuit has not interpreted this section of the Act, other circuits provide guidance. Colby v. J.C. Penney Co., Inc., 811 F.2d 1119, 1123 (7th Cir. 1987); Richards v. Local 134, Int'l Brotherhood of Electrical Workers, 790 F.2d 633, 636 (7th Cir. 1986) (district court should give "respectful consideration" to the decisions of other circuits when no Seventh Circuit authority is on point). Certainly, Roll Coater is correct if this Court gives effect to the statute as written.

However, Roll Coater is not correct when it terms orders to comply with the Act and civil actions as redundant and unnecessary. The obvious result of its reading is that if USEPA chooses to bring suit, it could not order future compliance with the Act. Certainly both a penalty for past damage and future compliance is necessary. Moreover, if its reading is adopted, when the USEPA orders compliance, violators would be rewarded by the forgiving of all prior noncompliance. This reading is plainly inconsistent with the strong enforcement policy of the Act. Therefore, this Court holds that the USEPA is not limited to one remedy and may seek both penalties for past violations and prevention of future violations. See United States v. Earth Sciences, Inc., 599 F.2d 368, 375-76 [9 ELR 20542] (10th Cir. 1979) (rejecting argument the EPA is limited to only one remedy).

#### 2. Equitable Estoppel

Roll Coater's second argument is that the United States is estopped from bring [sic] this civil action. The doctrine of equitable estoppel states that when one party relies to its detriment upon the material omissions of another, justice demands that the malfeasor be estopped from bringing claims against the injured party that it might otherwise assert. Portmann v. United States, 674 F.2d 1155 (7th Cir. 1982). Certainly the government may be estopped from asserting claims against parties that it has wronged. Id. at 1167.

However, in this case, equitable principles are more applicable to the issue of damages than the issue of liability. The Clean Water Act is a strict liability statute, and liability ensues if there is a violation. USEPA's failure to contact Roll Coater does not provide sufficient justification to ignore the statute. In contrast, USEPA's failure to enunciate the involvement of the various levels of government is important in determining the appropriate penalty. See infra discussion concerning mitigation of damages.

#### 3. Laches

Roll Coater's third argument that it is not liable for violations of the Act is that the equitable doctrine of laches bars recovery. The basis of the doctrine is that equity aids the vigilant and not those who slumber on their rights. See National Legal Defense & Education Fund, Inc., 753 F.2d 131, 137 (7th Cir.), cert. denied, 472 U.S. 1021 (1985).

Roll Coater states that delay in bringing suit significantly increased its liability exposure. The Seventh Circuit has held that prejudice "arises when a defendant adjusts its position in a manner that would not have occurred if the plaintiff had not delayed. . . . Laches applies to protect a defendant not only from diminished likelihood of success on the merits at trial, but also from unfairly accentuated damages occasioned only by a plaintiff's unreasonable delays." Zelazny v. Lyno, 853 F.2d 540, 543-44 (7th Cir. 1988) (emphasis omitted). Without expressly stating, Roll Coater is arguing that it could have completed the treatment plant much earlier if the federal government had ordered compliance. Otherwise, delay by USEPA would not have increased its liability exposure. No allegations were made that the treatment facility actually completed was inadequate due to inaction by USEPA. This increase in liability exposure is not enough for this Court to completely bar recovery. Delay in seeking compliance is considered in determining the appropriate penalty.

#### B. Penalty

In determining the appropriate penalty, first, the statutory maximum penalty must be determined. Second, the Court reduces the penalty in accordance with factors indicated by Congress. The Court must clearly indicate the weight given to each of the factors and the factual findings that support its conclusion. Atlantic States Legal

---

1. The United States argues that Roll Coater has been in violation since December 1, 1985. However, the United States has failed to enter into evidence any Monthly Monitoring Reports ("MMR"), or other evidence that Roll Coater was in violation before June 1986. Although it is extremely unlikely that Roll Coater was in compliance between these dates, the United States has the burden of proof, and the Court holds that it has failed to carry its burden as to any possible violation occurring before June 1986.

*Foundation. Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 [20 ELR 20788] (11th Cir. 1990).

### 1. Maximum Penalty

When the Act is violated, a penalty is mandated. Section 309(d), 33 U.S.C. §1319(d), provides:

> Any person who violates section 301, 302, 306, 307, 308, 318, or 405 of the Act, ... shall be subject to a civil penalty of not to exceed $25,000 per day for each violation.[2]

The Court calculates the statutory maximum penalty for the proven violations to be $52,945,000.[3] In calculating the statutory maximum, each monthly violation constitutes a violation for each day of that month. *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 897 F.2d 1139-40 [20 ELR 20788] (11th Cir. 1990).

### 2. Mitigation Factors

Certainly Congress intended to provide a substantial deterrent effect by including §309(d); however, Congress also included mitigating factors.

> In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. §1319(d). Additionally, the Court must consider that the purpose of a civil penalty under the Act is threefold: retribution, deterrence, and restitution. *Tull v. United States*, 481 U.S. 412, 422 (1987).

#### a. Seriousness of Violations

The first factor to be considered is the seriousness of the violations. Roll Coater's violations were undeniably quite considerable. Uncontradicted evidence presented at trial indicated that for the vast majority of time, Roll Coater exceeded applicable average monthly limits by more than one thousand percent. (Witschonke affidavit).

However, large violations do not necessarily mandate that a Court cannot reduce the maximum penalty. The parties stipulated that USEPA sampled Brandywine Creek in March 1990 (the creek into which Greenfield's public owned treatment works ("POTW") discharges) and found no evidence of environmental harm traceable to Roll Coater. The United States argues that this Court should accept, without evidence, that all violations involving toxic pollutants are serious. Certainly lack of damage is not a defense to liability in an action under the Act, but it is a mitigating factor as to damages. In the criminal law, one who attempts to kill, but through pure chance only injures a person, is punished less severely than a person who is successful in completing the act. Similarly, in this situation, Roll Coater's effluent may not have caused damage to the environment due to the actions of Greenfield's POTW, and not its own actions; however, this lack of damage is still a mitigating factor.[4]

---

2. Prior to amendment in 1987, §309(d) provided that violators would be subject to a civil penalty not to exceed $10,000 per day of such violation. Thus, each violation prior to February 4, 1987, is subject to a $10,000 penalty, and each violation after February 4, 1987 is subject to a $25,000 penalty.

3. *Chromium*

  6/1/86-2/3/87—8 months of violations of the monthly average constitutes 248 separate violations; 248 x $10,000 = $2,480,000.

  2/4/87-9/30/89—30 months of violations of the monthly average constitutes 908 separate violations (July and August 1989 excluded); 908 x $25,000 $22,700,000.

  *Zinc*

  6/1/86-2/3/87—8 months of violations of the monthly average constitutes 248 separate violations; 248 x $10,000 = $2,480,000.

  2/4/87-9/30/89—30 months of violations of the monthly average constitutes 908 separate violations (July and August 1989 excluded); 908 x $25,000 $22,700,000.

  *Cyanide*

  6/1/86-2/3/87—1 month of violations of the monthly average constitutes 31 separate violations; 31 x $10,000 = $310,000.

  2/4/87-9/30/89—3 months of violations of the monthly average constitutes 91 separate violations; 91 x $25,000 = $2,275,000.

4. In *Public Interest Research of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 79 (3d Cir. 1990), the Third Circuit upheld the district court's finding that violations were serious without a particularized showing of harm. However, *Powell Duffryn* concerned

---

The United States argues that when Congress abandoned harm to the environment as the basis of the federal water control program in 1972, Congress also abandoned lack of harm as a mitigating factor. However, as the United States points out, water quality was dropped as the standard because of substantial problems in enforcement. One of the purposes of the new technology-based effluent limitations was "to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement." S. Rep. No. 414, 92d Cong., lst Sess. 65 (1971). Clearly, completion of an environmental impact study every time the federal government attempted to regulate an individual company would be ponderous if required to find liability. However, considering harm at the damage stage of litigation places the issue of environmental harm on the defense. Lengthy fact finding, investigations, and negotiations are appropriate in high stakes litigation. The change of the standard in determining liability does not foreclose considering lack of harm as a mitigating factor. As used in the Act, "serious" means more than the amount of pollutant over that authorized by the regulations.

#### b. Economic Benefit

Pursuant to §309(d) of the Act, this Court must next consider its economic benefit to Roll Coater. resulting from the non-compliance. The implication of including this factor is that unless the company is fined an amount at least as great as the economic gain in not complying with the regulations, the statute serves little deterrent value. However, other factors may decrease the imposed penalty below the calculated economic benefit.

As is always true for an issue of this type, the Court is faced with "duelling" experts. The United States' expert calculated the economic benefit of the avoided and delayed expenditures as $1,473,736. Predictably, the defendant determined the economic value to be much smaller. Roll Coater's expert testified that the economic benefit of non-compliance was between $631,173 and $778,907.[5] Due to the many differences in the procedures used, the Court is left to swim, or at least tread water, in this most muddy pool. A Court may not merely determine that one expert was more credible, but must examine the differences between the procedures used.

Three primary differences between the two methods accounted for the vast majority of the discrepancy. This Court will not address the many other variables as they are insignificant. The first difference is the discount factor applied. Second, the beginning date of non-compliance varied from December 1, 1985, to June 1, 1986. Third, the United States considered total costs of the new facility and Roll Coater did not consider costs not necessary for compliance with the Act.

The United States used a discount factor of 16 percent. This factor was based on a capital asset pricing model which considers what a person should gain on an investment of average risk. Roll Coater used a discount factor of 10.84 percent. This discount factor was calculated by the weighted average costs of capital method. This method concentrates on the return for a given industry and does not look at investments in general. Because Roll Coater should not be punished for not investing its capital in other industries, the Court holds that Roll Coater's discount factor of 10.84 percent is applicable in this situation.

The second major reason for the difference is that the beginning date of non-compliance varied from December 1, 1985, to June 1, 1986. The United States used December 1, 1985, and Roll Coater used June 1, 1986. Roll Coater used June 1, 1986, because that is the date the United States first presents evidence of non-compliance. *See* calculation of maximum penalty above. The United States used December 1, 1985, because that is the effective date of the Act. Although both positions can be defended, it is unjust to penalize Roll Coater in determining economic benefit due to delayed compliance for a time period not considered by the United States when it calculated the

---

direct runoff and the case at bar concerns effluent that will be treated at a POTW. In the former situation, nothing could prevent the toxic chemicals from entering the waterway. In the latter situation, the POTW interceded and it is quite possible that toxic chemicals never entered the stream. Thus, harm cannot be assumed based on a violation of the regulations.

5. On January 14, 1991, Roll Coater filed a motion to reopen the record and admit additional testimony. This motion was denied. By affidavit, Roll Coater attempted to introduce evidence that its estimate of economic benefit should be reduced to between $464,691 and $575,709. As is made clear in subsequent discussion, any reduction in Roll Coater's economic benefit would not reduce the final penalty imposed.

maximum statutory penalty. Therefore, June 1, 1986, is the applicable non-compliance date.

The final significant discrepancy in the two calculations is that the United States considered total costs of the new facility and Roll Coater did not consider costs not necessary for compliance with the Act. The Court will not undertake the timeconsuming process of listing all items which should be considered as necessary for compliance. It should be sufficient to note that a company should not be penalized for building more than the Act requires. Under the approach of the United States, the larger the new plant, the greater the economic benefit due to delayed compliance. Under the approach of Roll Coater, a company is only penalized for the facility they were mandated to build. Roll Coater's approach is more sound, and therefore, the Court adopts Roll Coater's procedure. [6]

In summary, the Court accepts the method and model used by Roll Coater for all three major discrepancies. Roll Coater calculated its economic benefit to be between $631,173 and $778,907. The Court accepts these figures for determination of the final penalty.

### c. History of Violations

The United States argues that Roll Coater is a "recidivist" violator and should be severely punished. Certainly, the United States has carried its burden in proving that Roll Coater violated the Act from 1986 through 1989. In *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1163 [20 ELR 20152] (D.N.J. 1989), *reversed on other grounds*, 913 F.2d 64 [20 ELR 21216] (3d Cir. 1990), the district court interpreted "any history of such violations" to include continuing violations. However, this Court reads "any history of such violations" in §309(d) of the Act to refer to previous violations not related to the instant litigation, and not a continuing violation. Continuing violations are adequately considered in the calculation of the maximum penalty, and in assessing the seriousness of the violation and good faith efforts to comply. A "recidivist" offender is one who has been caught and punished. Roll Coater does not have a history of violations because it has not been found guilty of a violation previous to the one at bar.

Even though Roll Coater is not a recidivist, the Court will not mitigate the penalty due to this factor. Roll Coater is not a first time offender who was surprised by the violation. Evidence presented at trial indicated that, while Roll Coater was unable to accurately determine the appropriate limits, Roll Coater was aware that it would probably be in violation. The maximum penalty punishes continuing violations and good faith mitigates the penalty after a violation. The "history of such violations" factor considers the time frame before a violation. Even though Roll Coater had not been found guilty of a previous violation, it was aware that it would probably be in violation. Therefore, the Court will not mitigate the maximum penalty due to this factor.

### d. Good Faith Efforts to Comply and Such Other Matters as Justice May Require

Most of the effort at trial was spent addressing the factors of good faith and justice. The gist of the United States' argument is that USEPA promulgated the Act on December 1, 1982; Roll Coater read the Act in early January 1983; and accordingly, Roll Coater is responsible for adhering to the Act's compliance date of December 1, 1985. The United States' position is that the federal program was separate from any state program, and any involvement of the State of Indiana is not relevant to the issue at bar. In terms of liability, the United States is correct; however, for determining the proper penalty, the Court will consider evidence of the difficulty of compliance and the actions of the State of Indiana. *See United States v. Edison Co.*, 725 F. Supp. 928, 933 (N.D. Ohio 1989) (good faith adherence to Ohio EPA's directives and guidance as well as possible lack of effective communication between the Ohio EPA and the United States EPA mitigates against a substantial penalty).

In terms of difficulty of compliance, Roll Coater presents evidence that USEPA was sending mixed signals to private companies

affected by the Act. Until spring 1983, several high ranking USEPA officials commented that the Act may be significantly changed in the near future and that compliance with certain aspects would no longer be required. Statements such as these would inhibit a private company from spending large sums of money on treatment facilities.

On February 3, 1984, William Ruckelshaus, then USEPA Administrator, established the Pretreatment Implementation Review Task Force ("PIRT") to provide recommendations of the day-to-day problems faced in implementing the pretreatment program. PIRT's charter was as follows:

> The common implementation problems experienced by industry, States and municipalities will be examined and options for program improvement developed and debated. The need for guidance, training programs, technical assistance, and policy for interpretation will be the focus of activity.

PIRT's final report was not published until eleven months before the effective date of the pretreatment standards. Additionally, guidance documents mandated by the PIRT Report were not published until September 1985, just three months before the effective date. Because of the complex nature of determining site-specific discharge limitations for the Roll Coater plant, these guidance documents were reasonably necessary to ensure proper application of the standards. Roll Coater could not have known, with any degree of certainty, what mass-based limits applied to its plant until it received a determination by the State in May 1986.

Roll Coater argues that it made a good faith effort to comply even after May, 1986, because it thought that if it complied with the state program, it was also complying with the federal program. In fact, Roll Coater began the process of designing a facility in conjunction with dictates from the State. Roll Coater presented uncontradicted evidence that USEPA did not suggest until August 30, 1988, that it had a role to play in the compliance process or that Indiana was not the exclusive governmental entity in charge of pretreatment obligations. This first contact was in the form of an administrative order issued to Roll Coater. Prior to the issue of the administrative order, the State of Indiana conducted all routine inspections of Roll Coater's wastewater treatment plant. Thus, it was reasonable for Roll Coater to believe that complying with Indiana's directives was all that was required. USEPA counters that it never said it did not have a role to play. This lack of communication is sufficient to allow this Court to not penalize Roll Coater for violations before August 30, 1988.

This is not simply a case of USEPA failing to diligently prosecute a violation. Certainly, when the USEPA and the defendant are in communication and the USEPA does not bring suit, the delay is not a basis for reduction of the penalty. This is just because the defendant knows it must satisfy the USEPA and it is the defendant's responsibility to do so. *See Public Interest Research of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 81 [20 ELR 21216] (3d Cir. 1990) (where USEPA and defendant are corresponding, delay in bringing suit will not reduce the penalty unless the USEPA has excused the noncompliance).

In this case, Indiana recognized and excused the noncompliance. Roll Coater complied with the State's directives in seeking to remedy its problems. Without setting out the lengthy history of the interplay between the State and Roll Coater relating to the construction of a new treatment facility, it is significant that no evidence at trial suggested that Indiana was dissatisfied with the actions of Roll Coater. Roll Coater, in good faith, relied on Indiana's directives. Now, USEPA seeks to impose liability notwithstanding Indiana's agreement to a compliance schedule. Because Roll Coater reasonably and in good faith relied on the requirements set by Indiana, a penalty will not be imposed until after Roll Coater became aware of USEPA's involvement on August 30, 1988.

Roll Coater maintains that it acted in good faith in delaying construction of the treatment facility, and hence, not complying with the pretreatment standards even after August 30, 1988. The most persuasive of its arguments is that prior to installing expensive oil separation and sand filter technologies at the Greenfield facility, Roll Coater installed and evaluated them at another facility. Certainly it makes economic sense to test new technology at one plant before installing the new technology at other plants. While testing the new technology, Roll Coater made several interim improvements to its existing Greenfield facility. As these interim measures were costly and

---

6. Roll Coater should not misunderstand this acceptance of their method to include all of the items it considered nonessential. For example, the Court considers interior drywall and paint essential to a building and should be include in the costs of compliance. Certainly, Roll Coater is correct not to include increased capacity, a lab not used for treatment of effluent, and even landscaping. The Court accepts Roll Coater's estimation because any difference in the final figure caused by these changes is inconsequential.

only contributed to pollution control, not production, they evidence good faith. Thus, Roll Coater acted in good faith in delaying construction of the facility even after August 30, 1988.

*e. Economic Impact on Violator*

No evidence was admitted at trial that indicated a large civil fine would have a material adverse effect on the operation of Roll Coater. Therefore, the Court will not reduce the civil penalty imposed on Roll Coater due to its economic impact.

**3. Penalty Imposed**

Based on the §309(d), 33 U.S.C. §1319(d), factors discussed above, Roll Coater is entitled to substantial mitigation of the maximum statutory penalty. First, until May 1986, Roll Coater could not have reasonably determined what levels applied to its plant. A period of eighteen months is needed to design and construct a treatment facility. Thus, Roll Coater could not have complied before October 1987. Justice requires that Roll Coater not be penalized for any violations before August 30, 1988, because it could not have reasonably known that satisfaction of state requirements did not satisfy the USEPA. Using August 30, 1988, as the first date a penalty could be imposed, the maximum penalty is recalculated to be $16,750,000.[7]

Second, while Roll Coater's violations were numerous, there was no proven damage to the environment, and hence, the violations were not serious within the meaning of the Act. The purpose of the Act is to prevent pollution of the nation's waterways. Roll Coater did not pollute a waterway, and the Act's purpose has not been defeated. However, Roll Coater did violate the Act and some penalty is required. A reduction in the penalty of less than 50 percent due to the lack of damage would not adequately represent that preventing harm to the environment is the purpose of the Act. A reduction of more than 50 percent would not preserve the deterrent effect upon others desired by Congress, and would not recognize the seriousness of any violation of the Act indicated by the strict liability structure of the Act. Thus, the lack of damage reduces the penalty by 50 percent.

Third, even after August 30, 1988, Roll Coater demonstrated good faith by making several interim improvements to the existing facility and delaying construction in order to develop new technology. Prior to installing expensive oil separation and sand filter technologies at the Greenfield plant, Roll Coater tested the procedure at another plant. While testing this new technology, Roll Coater, in conjunction with the State of Indiana, improved the treatment capabilities of the Greenfield facility. The interim improvements at the Greenfield plant provided no economic benefit to Roll Coater because they had no effect on production. Roll Coater acted in a reasonable manner in delaying construction until it could build a treatment facility that would utilize the latest technology, not just adequate technology. Good faith must be rewarded at a level sufficient to justify these interim measures, otherwise a company will chose to just accept the future penalty. While the reduction in the penalty imposed should not necessarily be a quid pro quo for the interim measures, the acts of Roll Coater indicate its good faith in working with the State of Indiana and the Court will reduce the penalty by an additional 75 percent. A smaller reduction would not adequately represent the significant measures taken by Roll Coater, and a larger reduction would overlook the fact that Roll Coater was still emitting unsatisfactorily treated effluent. Because Roll Coater failed to prove that a large penalty would have a detrimental economic impact, this factor does not mitigate the final penalty imposed. Also, the Court will not mitigate the penalty due to the lack of a history of violations. After all mitigation, the penalty is $2,093,750.[8]

The economic benefit resulting from the violation suggests that Roll Coater should be subject to a large penalty. As calculated above,

Roll Coater benefitted by an amount between $631,173 and $778,907 in delaying compliance with the federal regulations. Because the penalty after all mitigation is larger than the estimated economic benefit, and therefore will serve as a deterrent and a punishment, the final penalty imposed will not be increased. After considering the above factors, the Court finds that Roll Coater is subject to a civil penalty of $2,093,750.

**4. Remedy**

The final issue is whether penalties must be paid to the United States Treasury or whether other remedies are allowable. The United States argues that all civil penalties assessed pursuant to the Act must be paid to the Treasury. Roll Coater counters that the Court could, in the exercise of its equitable jurisdiction, allow other forms of restitution. Both statements are correct.

The Act does not specify where civil penalties are to be paid. However, for citizen suits, the legislative history makes clear that Congress intended that the penalties be paid to the Treasury. S. Rep. No. 414, 92d Cong., 2d Sess. 133; 31 U.S.C. §3302(c)(l). The majority of courts have consistently followed the legislative intent that in citizen suits, civil penalties must be paid to the Treasury.[9] *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 53 [18 ELR 20142] (1987); *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 14 n.25 [11 ELR 20684] (1981); *Public Interest Research of N.J. Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 82 [20 ELR 21216] (3d Cir. 1990). The issue of whether other remedies are available when the United States brings the action and judgment is rendered is a question of first impression.

First, Roll Coater argues that Congress intended that fines be directed to other projects. In support of its position, Roll Coater points out that in the Conference Report on the 1987 Clean Water Act amendments concerning government enforcement actions, Congress encouraged the resolution of enforcement suits by directing penalties toward research and other related projects:

> In certain instances settlements of fines and penalties levied due to NPDES permit and other violations have been used to find research, development and other related projects which further the goals of the Act. In these cases, the funds collected in connection with these violations were used to investigate pollution problems other than those leading to the violation. Settlements of this type preserve the punitive nature of the enforcement actions while putting the funds collected to use on behalf of environmental protection. Although this practice has been used on a selective basis, *the conferees encourage this procedure where appropriate.*

H. Rep. No. 1004, 99th Cong., 2d Sess. 139 (1986) (emphasis in original). This quotation is consistent with prior case law concerning consent to settlements and does not strongly support Roll Coater's position. The statement concerns "settlements of this type," not judgments. As previously pointed out, courts already allow other remedies in settlements because of their contractual nature. Because this Court is concerned with a judgment, the above quotation is of little value.

While this Court can understand an aversion to depositing civil penalties in the Treasury as not the most effective way to fight environmental problems, this Court is uncomfortable deciding environmental policy. A district court is not equipped to determine the best way to attack pollution problems in a given area. Roll Coater has asked this Court to sanction a specific research project. The Court does not have the means nor expertise to determine the likelihood of success of a particular research project. Additionally, Roll Coater has asked this Court to contribute toward the creation of a Center for Environmental Responsibility to house the Pollution Prevention Institute authorized by the Indiana General Assembly. A federal court should not be making a decision as to whether a state program should be funded.

Roll Coater argues that the Court could allow other remedies through its equitable jurisdiction when ordering injunctive relief. This is true. Under the Act, a court may fashion injunctive relief requiring a defendant to pay monies to other entities, if there is a nexus between

---

7. *Chromium*

   8/30/88–9/30/89—11 months of violations of the monthly average constitutes 335 separate violations (July and August 1989 excluded); 335 x $25,000 $8,375,000.

*Zinc*

   8/30/88–9/30/89—11 months of violations of the monthly average constitutes 335 separate violations (July and August 1989 excluded); 335 x $25,000 $8,375,000.

*Cyanide*

   8/30/88–9/30/88—no violations.

8. 0.5 [ 0.25 ( $16,750,000 ) ] = $2,093,750

9. The Act's prohibition against ordering the defendant to make payments to organizations other than the Treasury does not extend to settlement whereby the defendant does not admit liability and the court is not ordering nonconsensual monetary relief. *Sierra Club, Inc. v. Electronic Controls Design, Inc.,* 909 F.2d 1350, 1354 (9th Cir. 1990).

the harm and the remedy. But, once labeled as a civil penalty, the money must be paid to the Treasury. *Powell Duffryn*, 913 F.2d at 82. On July 12, 1990, the parties stipulated that the United States' claim for injunctive relief be dismissed without prejudice. Thus, even if the Court were to agree with Roll Coater on this point, without this claim for injunctive relief, the Court lacks equitable jurisdiction to grant Roll Coater's request for an alternative remedy.

Roll Coater further states that this Court can order payment of money to entities other than the Treasury as long as the payment is not characterized as a civil penalty. The Court is at a loss for another characterization other than an injunction or a civil penalty. Any such payment is not a voluntary contribution after judgment. Therefore, for all the reasons set out above, Roll Coater must pay the imposed penalty to the United States Treasury and no other relief will be granted.

### III. Conclusion

In summary, the Court holds that defendant, Roll Coater, must pay $2,093,750 to the United States Treasury. Roll Coater failed to comply with regulations concerning pretreatment of effluent before its release into the City of Greenfield's sanitary sewer system. Roll Coater's violations were quite numerous and a significant penalty is warranted. However, several factors contribute to a sizable reduction from the statutory maximum.

IT IS SO ORDERED this 22 day of March, 1991.